[No. 8345.  Department One.  December 13, 1909.]

F. P. WEYMOUTH, *as Receiver of the Oudin & Bergman Fire Clay Mining & Manufacturing Company and Thos. F. Conlan, Appellant,* v. CHARLES P. OUDIN *et al., Respondents.*[1]

CORPORATIONS—STOCKHOLDERS—RECEIVER—ACTION BY—ESTOPPEL—PERSONS AFFECTED. Where there are no creditors of a corporation and a receiver is appointed to wind up its affairs, and sues on claims, representing the rights of a faction of the stockholders, an estoppel against such stockholders operates against the receiver.

CORPORATIONS—STOCKHOLDERS AND TRUSTEES—DEADLOCK—FAILURE TO OPERATE PLANT. Where, owing to the obstinacy of two parties each owning one-half of the stock of a corporation, there was no board of trustees to manage its affairs, and the deadlock prevented an election, the parties are *in pari delicto*, and there can be no recovery by one from the other by reason of business losses, or failure to repair and operate the plant after a loss by fire.

Appeal from a judgment of the superior court for Spokane county, Kennan, J., entered May 3, 1909, upon findings in favor of the defendants, after a trial on the merits before the court, dismissing an action by the receiver of a corporation for an accounting and for damages. Affirmed.

*R. L. Edmiston,* for appellant.

*W. J. Thayer,* for respondents.

RUDKIN, C. J.—After a turbulent existence of twelve or thirteen years, the Oudin & Bergman Fire Clay Mining and Manufacturing Company, a corporation organized under the laws of this state, was dissolved by decree of the superior court of Spokane county, which was affirmed by this court on appeal. *State ex rel. Conlan v. Oudin & Bergman Fire Clay Min. & Mfg. Co.,* 48 Wash. 196, 93 Pac. 219. But though the legal entity is dead, the present action goes to show that its discordant elements still live. The corporation

[1] Reported in 105 Pac. 1027.

has been repeatedly before this court in litigation with its stockholders, involving not only its rights but its legal existence, as will appear from the following citations: *State ex rel. Oudin v. Superior Court,* 28 Wash. 584, 68 Pac. 1052; *Bergman v. Oudin,* 30 Wash. 703, 70 Pac. 1135; *State ex rel. Oudin v. Superior Court,* 31 Wash. 481, 71 Pac. 1905; *Oudin & Bergman Fire Clay Min. & Mfg. Co. v. Conlan,* 34 Wash. 216, 75 Pac. 798; *Oudin & Bergman Fire Clay Min. & Mfg. Co. v. Cole,* 35 Wash. 647, 77 Pac. 1066; *State ex rel. Oudin & Bergman Fire Clay Min. & Mfg. Co. v. Superior Court,* 37 Wash. 30, 79 Pac. 483; *Oudin & Bergman Fire Clay Min. & Mfg. Co. v. Conlan,* 38 Wash. 134, 80 Pac. 283; *State ex rel. Conlan v. Oudin & Bergman Fire Clay Min. & Mfg. Co., supra; Conlan v. Oudin,* 49 Wash. 240, 94 Pac. 1074.

Notwithstanding all this litigation, a perusal of the pleadings and testimony in this record would indicate that previous judgments go for naught. The pleadings are very voluminous, so much so, indeed, that a bare summary of the issues presented would extend far beyond the limits allotted to an ordinary opinion. However, we feel that the following brief history of the corporation and its affairs will sufficiently present the question for decision. During the early years of its existence the corporation was engaged in the manufacture of fire brick, sewer pipe and other clay products. At the outset, in 1893, its corporate stock of 1,500 shares was all held by two families, the defendant Charles P. Oudin, holding one share, his wife, Eva M. Oudin, holding 749 shares, and one Bergman holding the remaining 750 shares. In 1901 Bergman sold one-half his stock to one Conlan, and in April 1903, the remaining half, so that from the latter date to the date of dissolution the whole capital stock was held and owned by the Oudins and Conlan, each holding one-half thereof. Prior to the sale of the last of the Bergman stock, Oudin and Bergman were trustees of the corporation, which had but two trustees. The former

was president of the board of trustees and treasurer, while the latter was vice president and secretary. Upon the sale of the last of the Bergman stock his office in the company became vacant, and the stockholders were unable to fill the vacancy. Whenever an attempt was made to do so the Oudins voted their 750 shares for Mrs. Oudin, Conlan voted his 750 shares for himself, and each refused to vote for the other. Matters remained in this condition up to the time of the dissolution of the corporation, and this was the principal if not the only reason assigned for its dissolution.

During the year 1902 and the early part of the year 1903 the corporation was in the hands of a receiver appointed by the superior court of Spokane county. In June of the former year, the defendant Charles P. Oudin was out of employment, and his brothers residing in New York agreed to advance the necessary funds to establish a modern fire brick and sewer pipe factory near Spokane, of which Charles P. Oudin should be manager. Oudin notified Conlan of this offer and Conlan told him to go ahead, that he had no desire to keep him out of employment. The defendant American Fire Brick Company was thereupon incorporated in June 1902, and during the ensuing few months it purchased real property and installed a new plant as proposed. The money for this purpose was advanced and contributed solely by the brothers of Charles P. Oudin residing in New York.

After the completion of the new plant it was leased to the old company for some time during the year 1903, and the two plants were managed and operated by the defendant Charles P. Oudin. Late in 1903 this lease was cancelled, and soon thereafter the plant of the old company was destroyed by fire, or nearly so. Before the destruction of its plant, litigation was only a diversion for the old company; but from that time on it became its chief and only business, the plant itself being abandoned. The receiver in this action was appointed upon the dissolution of the corporation, and seeks to recover from the Oudins, according to our analysis

of the complaint; first, the plant constructed by the American Company, on the theory that moneys belonging to the old company entered into its construction; second, an accounting; and, third, damages for loss of profits arising from the failure of the Oudins to repair the plant and conduct and carry on the business of the old company. It may not be out of place at this time to say that the rights of creditors are not involved; that any recovery will inure to the benefit of Conlan alone, who is the real party in interest, and that any estoppel against Conlan will prevail against the receiver who sues for his benefit.

In so far as the new company is concerned, there is not the slightest testimony in the record tending to show that any of the old company's funds went into its construction or operation. In fact the contrary is clearly and indisputably shown. It would serve no purpose to review the testimony on this point, for, from the standpoint of the appellant, there is nothing tangible to review. This also disposes of any claim for an accounting in so far as the new company is concerned. The appellant challenges the validity of the lease from the new company to the old, and also the right of the Oudins to pay out money or make disbursements on account of the old company. We think the finding of the court that the lease was valid is in accordance with the testimony, but in any event its validity would seem to have been adjudicated in prior actions. We also agree with the trial court that all moneys received by the Oudins have been fully accounted for, and all disbursements properly made, except as otherwise found by the court in its decree.

The appellant further claims damages arising from the failure of the Oudins to rebuild and operate the old plant. The nature of this contention will appear from the following offer of proof:

"If the court please, in order to preserve the record I desire at this time to show, to let the records show—we expect to show by this witness that at the time of the damage

by fire to this plant that this estate was possessed of a pottery factory that $2,500 would have repaired and put in as good condition as it was before the fire, to have been operated during the year 1903 and succeeding years, and that with those repairs this factory would have earned a net profit to the stockholders in addition to the necessary repairs and betterments thereon from time to time a sum of not less than $6,000 per year for the years 1904-1905-1906-1907 and 1908 and that during these years the market for the product of such a factory was such as to have given a ready market to dispose of all these goods and that at this time such a plant would be worth not less than—such a plant and extensions thereto that could have been developed at this plant down on what is known as the Chicken Ranch Pottery premises,—of not less than $50,000 and these profits that could have been made at this factory in the city of Spokane and the moneys that were on hand at the time that receiver Cole was discharged and turned the property back to the company, to wit, $2,000 in cash, a little less than that—to wit, $1,990 in cash and $839 in good accounts and merchandise, the market value of which was over $5,000; that the profit of the plant during the year 1903, that the profits there would have been about $8,000 over and above the expenses of operating; which with the auxiliary plant that could have been installed in the factory building owned by this company at Mica, Washington, which is adequate for a modern pottery factory, at which time there was one kiln of 20 ft. in diameter and a brick stack adequate to carry three other kilns, all of which could have been equipped and put in operation by the opening of the season of 1904 at an expense not to exceed the amount of cash available, or about $16,000—which plant at Mica could have been operated at a profit of not less than $6,000 during the years 1904, 1905, 1906 and 1907 and that our plant at this time would be worth not less than $50,000."

Manifestly no such duty rested upon the Oudins. There was no board of trustees, and no person authorized to act for the corporation. For this state of affairs the Oudins and Conlan were equally responsible. Neither party had any right of action against the other by reason of the manner in which the stock was voted or for the refusal of either to vote

for the other. When the stockholders found the corporation without a board of trustees to manage its affairs, two courses were open to them, one to reorganize the board, the other to dissolve the corporation and divide its property. Their obstinacy prevented the former, the law compelled the latter. No doubt had these parties devoted the energies they have displayed in this litigation to some legitimate purpose they would have something to show for it besides an accumulation of costs and a wrecked business, but under the circumstances neither can charge their failures or misfortunes to the other. They are *in pari delicto* in that respect. We have not deemed it necessary to refer to the assignments of error, but the foregoing will sufficiently disclose the reasons for our judgment.

The judgment is affirmed, and we think the peace of society and the ends of justice will be best subserved by closing this receivership at the earliest possible date.

GOSE, MORRIS, FULLERTON, and CHADWICK, JJ., concur.