

**FILE**

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE APR 1 1 2013

Madsen, C.J.
CHIEF JUSTICE

This opinion was filed for record
at 8:00 a.m. on Apr 11, 2013

Ronald R. Carpenter
Supreme Court Clerk

IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 86772-1 |
| Respondent, | ) | |
| v. | ) | En Banc |
| DERRICK ROBERT EVANS, | ) | |
| Petitioner. | ) | Filed APR 1 1 2013 |

GONZÁLEZ, J.—Petitioner Derrick Robert Evans stole a business check from the small business where he worked, made the check out to himself for $500, then forged a signature on the check and cashed it. Evans was charged with identity theft and convicted after a bench trial. *See* RCW 9.35.020(1) ("No person may knowingly obtain, possess, use, or transfer a means of identification or financial information of another person, living or dead, with the intent to commit . . . any crime."); *see also* RCW 9.35.005(4) (citing RCW 9A.04.110); RCW 9A.04.110(17) (defining "person" to include "any natural person and, where relevant, a corporation"). Evans now challenges his conviction on the ground that RCW 9.35.020 (the identity theft statute) criminalizes theft of a natural person's identity but does not criminalize theft of a *corporate* identity—or in the alternative, that the statute is unconstitutionally vague.

We reject Evans's arguments and affirm the Court of Appeals. The plain language and legislative history of the identity theft statute demonstrate that theft of a corporate identity is a crime. The identity theft statute provided fair warning to Evans and other persons and contains sufficiently objective standards for purposes of enforcement. We thus affirm Evans's conviction.

## I. FACTS AND PROCEDURAL HISTORY

In October 2009, Evans stole a business check from his employer, a small company called Allube Inc. that was engaged in the business of automobile maintenance and repair in Grays Harbor County, Washington. Evans forged a name on the stolen check and cashed it for $500. He was charged with second degree identity theft in violation of RCW 9.35.020(3). Evans was convicted after a bench trial and sentenced to 6 months in jail, followed by 12 months of community custody.

Evans appealed, arguing that the identity theft statute either does not proscribe theft of a corporate identity or is unconstitutionally vague. The Court of Appeals upheld Evans's conviction in a published opinion, holding that RCW 9.35.020 proscribes theft of a corporate identity, provides fair warning that theft of a corporate identity is a crime, and establishes sufficient standards for enforcement. *State v. Evans*, 164 Wn. App. 629, 265 P.3d 179 (2011). We granted discretionary review.

## II.   STANDARD OF REVIEW

Issues of statutory construction and constitutionality are questions of law subject to de novo review. *State v. Bradshaw*, 152 Wn.2d 528, 531, 98 P.3d 1190 (2004).

## III.   ANALYSIS

We reject Evans's arguments. First, the plain language and legislative history of the identity theft statute establish that the statute protects both individual and corporate identities. The legislature intended to protect small businesses and other corporations as well as natural persons from the substantial harms caused by identity theft, whether in the form of stolen checks, fraudulent loans, or the myriad other ways identity theft can occur.

Second, as a matter of due process, the identity theft statute is not unconstitutionally vague. The statute provides fair warning to Evans and others that theft of a corporate identity can be punished as a crime. The mere fact that a term or phrase requires interpretation is not sufficient to render a criminal statute void for vagueness. Further, application of the statute to theft of corporate identities is not inherently subjective. The relevant standards are clear and workable, and there is no substantial risk of arbitrary enforcement. We affirm Evans's conviction for these reasons.

1.    Statutory Interpretation

We must determine, according to our established principles of statutory interpretation, whether the identity theft statute is intended to protect corporations from theft of the corporate identity. The purpose of statutory interpretation is "to determine and give effect to the intent of the legislature." *State v. Sweany*, 174 Wn.2d 909, 914, 281 P.3d 305 (2012); *State v. J.P.*, 149 Wn.2d 444, 450, 69 P.3d 318 (2003); *In re Pers. Restraint of Williams*, 121 Wn.2d 655, 663, 853 P.2d 444 (1993).

When possible, we derive legislative intent solely from the plain language enacted by the legislature, considering the text of the provision in question, the context of the statute in which the provision is found, related provisions, and the statutory scheme as a whole. *State v. Ervin*, 169 Wn.2d 815, 820, 239 P.3d 354 (2010); *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002). Plain language that is not ambiguous does not require construction. *State v. Delgado*, 148 Wn.2d 723, 727, 63 P.3d 792 (2003); *State v. Wilson*, 125 Wn.2d 212, 217, 883 P.2d 320 (1994).

If more than one interpretation of the plain language is reasonable, the statute is ambiguous, and we must then engage in statutory construction. *City of Seattle v. Winebrenner*, 167 Wn.2d 451, 456, 219 P.3d 686 (2009); *State v. Jacobs*, 154 Wn.2d 596, 600-01, 115 P.3d 281 (2005). We may then look to legislative history for assistance in discerning legislative intent. *Ervin*, 169 Wn.2d at 820; *State v. Bash*, 130 Wn.2d 594, 601, 925 P.2d 978 (1996).

If a penal statute is ambiguous and thus subject to statutory construction, it will be "strictly construed" in favor of the defendant. *State v. Hornaday*, 105 Wn.2d 120, 127, 713 P.2d 71 (1986); *Wilson*, 125 Wn.2d at 216-17; *Jacobs*, 154 Wn.2d at 601. This means that we will interpret an ambiguous penal statute adversely to the defendant only if statutory construction "clearly establishes" that the legislature intended such an interpretation. *Winebrenner*, 167 Wn.2d at 462. Otherwise, if the indications of legislative intent are "insufficient to clarify the ambiguity," we will then interpret the statute in favor of the defendant. *In re Post Sentencing Review of Charles*, 135 Wn.2d 239, 250 & n.4, 252-53, 955 P.2d 798 (1998). This is known as "the rule of lenity." *Id.* at 250 n.4; *Jacobs*, 154 Wn.2d at 601. Requiring a relatively greater degree of confidence when resolving ambiguities within penal statutes against criminal defendants helps further the separation of powers doctrine and guarantees that the legislature has independently prohibited particular conduct prior to any criminal law enforcement. *See United States v. Bass*, 404 U.S. 336, 348-49, 92 S. Ct. 515, 30 L. Ed. 2d 488 (1971); *United States v. Wiltberger*, 18 U.S. (5 Wheat) 76, 95, 5 L. Ed. 37 (1820); *cf. State v. Rice*, 174 Wn.2d 884, 901, 279 P.3d 849 (2012) (noting "the substantial liberty interests at stake" within the criminal justice system, the "awesome consequences" of criminal prosecution, and thus "the need for numerous checks against corruption, abuses of power, and other injustices" (internal quotation marks omitted) (quoting *State v. Pettitt*, 93 Wn.2d 288, 294-95, 609 P.2d 1364 (1980))).

In sum, our interpretation of a penal statute will be either the only reasonable interpretation of the plain language; or, if there is no single reasonable interpretation of the plain language, then whichever interpretation is clearly established by statutory construction; or, if there is no such clearly established interpretation, then whichever reasonable and justifiable interpretation is most favorable to the defendant. As explained below, although the plain language of the identity theft statute is ambiguous on its own, the relevant legislative history clearly establishes that the legislature intended to protect small businesses and other corporations from identity theft. Thus, the rule of lenity does not apply and we interpret the statute adversely to Evans.

### a.   Plain Language

The plain language of RCW 9.35.020 does not resolve whether corporations are included within the class of potential direct victims of identity theft. The statute prohibits any "person" from obtaining or using a "means of identification" or "financial information" of "another person, living or dead," with the intent to commit a crime. Although "person" often refers to an individual human being, "its meaning varies within the RCW" in distinct legal contexts and for particular purposes. *Segaline v. Dep't of Labor & Indus.*, 169 Wn.2d 467, 473, 238 P.3d 1107 (2010). For purposes of chapter 9.35 RCW, "person" is defined by reference to RCW 9A.04.110, which defines "person" as "any natural person and, where relevant, a corporation, joint stock association, or an unincorporated association." RCW 9A.04.110(17); *see* RCW 9.35.005(4). Although corporations, "by their very nature as artificial creatures,

are impersonal, possessing neither emotions nor sentiments," *Grayson v. Curtis Pub'g Co.*, 72 Wn.2d 999, 1014, 436 P.2d 756 (1967) (Hale, J., dissenting), the "'corporate personality is a fiction'" sometimes "'intended to be acted upon as though it were a fact,'" *Tyee Constr. Co. v. Dulien Steel Prods., Inc.*, 62 Wn.2d 106, 112, 381 P.2d 245 (1963) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945)). Because the legislature for purposes of the identity theft statute has specifically defined the term "person" to include corporations "where relevant," we must adhere to that definition for purposes of statutory interpretation and consider whether corporations are relevant in the context of identity theft. *See State v. Sullivan*, 143 Wn.2d 162, 175, 19 P.3d 1012 (2001); *State v. Yancy*, 92 Wn.2d 153, 156, 594 P.2d 1342 (1979); *cf. J.L. Cooper & Co. v. Anchor Sec. Co.*, 9 Wn.2d 45, 69, 113 P.2d 845 (1941) ("'All fictions of law have been introduced for the purpose of convenience and to subserve the ends of justice.'" (quoting *State ex rel. Attorney General v. Standard Oil Co.*, 49 Ohio St. 137, 30 N.E. 279 (1892))).

Corporations, especially small businesses, are clearly relevant in this context as potential direct victims of identity theft. A third party's use of a corporation's "means of identification" or "financial information" easily could "result in significant harm to [the corporation's] privacy, financial security, and other interests"—precisely the type of harm that the identity theft statute is intended to prevent. RCW 9.35.001; *see, e.g.*, *United States v. Hilton*, No. 5:10CR2, 2010 WL 2926055, at *3 (W.D.N.C. July 23, 2010) (unpublished) ("[C]orporate identity theft is no less damaging than personal

7

identity theft, as this case illustrates. The alleged theft of the Woodsmiths Company

name in this case is claimed to have led to the ruin of the company and the loss of jobs

for all of its employees."); *State v. McVay*, noted at 157 Wn. App. 1004, 2010 WL

2904148, at *1, 2 (unpublished)[1] (corporation was direct victim of identity theft);

*State v. Meske*, noted at 149 Wn. App. 1002, 2009 WL 449071, at *1 (unpublished)

(same); *cf. Steele v. State*, 85 Wn.2d 585, 592-93, 537 P.2d 782 (1975) (noting that

corporations are afforded a limited "'right to privacy'" under the law (quoting *United*

*States v. Morton Salt Co.*, 338 U.S. 632, 652, 70 S. Ct. 357, 94 L. Ed. 401 (1950))).

Indeed, both "financial information" and "means of identification" are defined to

include items that would be considered personal and sensitive information for a

corporation as a legal person. *See* RCW 9.35.005(1) ("[f]inancial information"

includes "[a]ccount numbers and balances[,] [c]odes, passwords, . . . tax identification

numbers, . . . and other information held for the purpose of account access or

transaction initiation"); RCW 9.35.005(3) ("[m]eans of identification" includes "[a]

current or former name of the person, telephone number, an electronic address, . . . or

tax identification number"); *see also* RCW 9.35.001 (legislature intended to prevent

misuse of "personal and sensitive information").

---

[1] Consistent with GR 14.1(a), which prohibits parties from citing an unpublished opinion of the Court of Appeals *as an authority*, we are citing to such opinions in this instance not as precedent but only to show that, in actual practice, identity theft has been known to cause harm to corporations. *Cf. Dahl-Smyth, Inc. v. City of Walla Walla*, 148 Wn.2d 835, 839 & n.4, 64 P.3d 15 (2003) (citing to unpublished opinion not as precedent but instead because it had influenced the proceedings below).

Under RCW 9.35.020, a victim of identity theft must be "another person, living or dead," and corporations can qualify in one of two ways. First, all corporations simply can be considered dead in at least one sense of the term. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 579 (2002) (defining "dead" as "incapable of feeling or of being stirred emotionally or intellectually" or instead as "not naturally endowed with life: inanimate, inert"). Second, in the alternative, a corporation considered a "person" also can be considered "living or dead" depending on whether it remains in operation or instead has been dissolved. *See, e.g., Weymouth v. Oudin,* 56 Wash. 315, 315, 105 P. 1027 (1909) ("[A] corporation . . . was dissolved by decree . . . . But though the legal entity is dead, the present action goes to show that its discordant elements still live."). In this sense, "living" can be defined as "active, effective, [and] functioning," while "dead" can be defined as "lacking power or effect," as in "a dead law" or a dead human being. WEBSTER'S, *supra,* at 579, 1324. On numerous occasions, Washington courts have referred to corporations as living or dead in this manner. *See Ballard Square Condo. Owners Ass'n v. Dynasty Constr. Co.,* 158 Wn.2d 603, 621, 146 P.3d 914 (2006) (J.M. Johnson, J., concurring) (acknowledging the "common law notion that a corporation died at dissolution"); *Pacesetter Real Estate, Inc. v. Fasules,* 53 Wn. App. 463, 468, 767 P.2d 961 (1989) (noting that "once [the] reinstatement period passes, [a] corporation is 'dead'" (quoting *Globe Constr. Co. v. Yost,* 173 Wash. 522, 527, 23 P.2d 892 (1933))); *Clark v. Groger,* 102 Wash. 188, 192, 172 P. 1164 (1918) (argument regarding a "dead

corporation's debts"); *State ex rel. Dyer v. Middle Kittitas Irrigation Dist.*, 56 Wash. 488, 495, 106 P. 203 (1910) ("The real defendant is the corporation, which still lives and which must act through agents."); *Hawley v. Bonanza Queen Mining Co.*, 61 Wash. 90, 91, 111 P. 1073 (1910) ("The complete dissolution of a corporation destroys its capacity to be sued at law because a judgment can no more be rendered against a dead corporation than against a dead man."); *Oilure Mfg. Co. v. Pidduck-Ross Co.*, 38 Wash. 137, 143, 80 P. 276 (1905) (denoting where the "plaintiff company lives and does business"); *Sherron Assocs. Loan Fund V v. Galaxy Gaming Corp.*, noted at 140 Wn. App. 1013, 2007 WL 2358592, at *3 (unpublished)[2] ("Dead corporations may have successors just as dead people do."); *cf., e.g., Wachovia Sec., LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 753 (7th Cir. 2012) ("Loop's counsel also represented that Loop was a 'dead company.'"); *Amalgamated Sugar Co. v. Vilsack*, 563 F.3d 822, 836 (9th Cir. 2009) (transaction "was attempting to resurrect a dead company"); *Allee v. Medrano*, 416 U.S. 802, 811, 94 S. Ct. 2191, 40 L. Ed. 2d 566 (1974) (noting "appellee union remains very much a live organization"); *In re United Sec. Trust Co.*, 321 Pa. 276, 285, 184 A. 106 (1936) ("[D]esirable uniformity of administration will be attained by applying the Bankruptcy Rule in all cases of the distribution of the assets of insolvents *whether living or dead, individual or corporate*, and . . . the Bankruptcy Rule should hereafter be considered of general application."

---

[2] We are citing to an unpublished opinion in this instance not as legal precedent but only to show that, in actual fact, the terms "living" and "dead" have been used regularly and reasonably to describe corporations. *See supra* p. 8 note 1.

(emphasis added)). Under either of these reasonable interpretations, a corporation considered a "person" also can be considered "living or dead," and thus, a corporation can be a victim of identity theft under RCW 9.35.020. *Cf. Popular Merch. Co. v. "21" Club, Inc.*, 343 F.2d 1011, 1015 (C.C.P.A. 1965) (holding that corporations were included within statutory phrase "persons living or dead").

An alternative interpretation, excluding corporations as potential victims, is also reasonable based on the plain language of the identity theft statute. "Living or dead" can refer specifically to biologically active or previously biologically active beings, which would apply only to natural persons and not corporations. *See* WEBSTER'S, *supra,* at 579, 1324 (defining "living" as "not dead" and "exhibiting the life or motion of nature," and defining "dead" as "having ended existence as a living or growing thing – used of organisms"). Related provisions do lend support to this interpretation. The statutory definition of "means of identification" provides some examples relevant only to natural persons, although the list is not exclusive or exhaustive, and as noted above, it includes some examples applicable to corporations as well. *See* RCW 9.35.005(3) ("means of identification" includes "a social security [number]" and "unique biometric data"). Likewise, "financial information" is defined as "information identifiable to the *individual*," RCW 9.35.005(1) (emphasis added), and "individual" ordinarily refers to an individual human being, *see, e.g.*, RCW 19.215.010(3), but that is not always the case, *see, e.g.*, *Clinton v. City of New York*, 524 U.S. 417, 428-29 & n.13, 118 S. Ct. 2091, 141 L. Ed. 2d 393 (1998) ("[I]n the

11

context of the entire section Congress undoubtedly intended the word 'individual' to be construed as synonymous with the word 'person.'"). Adding to the potential confusion, "means of identification" is defined as information "personal to or identifiable with an individual *or other person* . . . ." RCW 9.35.005(3) (emphasis added). Although interpreting "living or dead" to exclude corporations as potential victims of identity theft would be relatively contrary to the apparent purposes of the identity theft statute, this interpretation does appear to be at least reasonable. Thus, we must turn to legislative history to resolve the ambiguity.

### b. Legislative History

The legislative history of the identity theft statute clearly indicates that the legislature intended to protect small businesses and other corporations from identity theft. The crime of identity theft was first established in 1999, LAWS OF 1999, ch. 368, § 3, and then amended in relevant part in 2001, LAWS OF 2001, ch. 217, §§ 1, 7, 9. The legislative history also includes various relevant and probative committee hearings and floor debates concerning these enactments. *Cf. Cosmopolitan Eng'g Group, Inc. v. Ondeo Degremont, Inc.*, 159 Wn.2d 292, 304, 149 P.3d 666 (2006) (relying on relevant recordings of committee hearings and floor debates to discern legislative intent); *Lutheran Day Care v. Snohomish County*, 119 Wn.2d 91, 104-05, 829 P.2d 746 (1992) (court will consider all materials that are "sufficiently probative" of legislative intent). This legislative history clearly establishes the legislature's intent to prevent harm to small businesses and other corporations caused by identity theft.

As originally enacted, the crime of identity theft included corporations as potential victims. The crime consisted of the "use" or "transfer" of any "means of identification" of "another person," and the phrase "living or dead" was absent. LAWS OF 1999, ch. 368, § 3(1). Although the term "person" was not defined, a related provision of the same section made clear that businesses were included. *See id.* § 3(4) ("If the *person* violating this section is a business that repeatedly violates this section, that person also violates the consumer protection act, chapter 19.86 RCW." (emphasis added)); *see also id.* § 3(1) (prohibiting any "person" from stealing the identity of "another person"); *cf. Medcalf v. Dep't of Licensing*, 133 Wn.2d 290, 301, 944 P.2d 1014 (1997) ("We are bound to construe the word . . . as having the same meaning in each subsection of the same statutory section.").[3] Leading up to this initial enactment, the legislature had been presented with testimony from a small number of actual victims of identity theft. *See Hearing on H.B. 1250 Before the H. Fin. Insts. & Ins. Comm.* (Feb. 9, 1999), *recording by* TVW, Washington State's Public Affairs Network, *available at* http://www.tvw.org; *see also Hearing on S.B. 1250 Before the S. Commerce, Trade, Hous., & Fin. Insts. Comm.* (Mar. 23, 1999).[4] The primary and most vocal witness testified that a large bundle of her checks had been stolen and then distributed among a large number of people and used at various commercial

---

[3] Evans's counsel incorrectly asserts that "person" was explicitly defined to include "an individual, partnership, corporation, or association," but that definition was directed to another section of the bill. *See* LAWS OF 1999, ch. 368, § 2(3).

[4] Recordings of all committee hearings and floor debates cited herein are available at http://www.tvw.org.

establishments; this created an administrative nightmare and damaged the victim's credit rating. *H. Fin. Insts. & Ins. Comm.*, *supra*, at 4 min., 52 sec. The same harms could easily befall a small business; indeed, the same victim testified that her investigation uncovered numerous other victims of identity theft, including one person she identified as a merchant. *S. Commerce, Trade, Hous., & Fin. Insts. Comm.*, *supra*, at 1 hr., 11 min., 15 sec. Although the focus clearly was on natural persons as victims, small businesses and other corporations were also relevant and there was no reason to exclude them from the protection of the statute—and as noted above, the plain language of the bill demonstrates that they were indeed included. The bill moved through committee easily and was passed unanimously and without substantial discussion or debate before the House or Senate. LAWS OF 1999, ch. 368; *see* H. Floor Debate on Substitute H.B. 1250 (Mar. 4, 1999), at 1 hr., 9 min., 36 sec.; S. Floor Debate on Substitute H.B. 1250 (Apr. 14, 1999, 1:30 p.m.), at 2 hr., 54 min., 53 sec.; H. Floor Debate on Substitute H.B. 1250 (Apr. 23, 1999, 1:30 p.m.), at 2 min., 45 sec.

In 2001, the legislature sought to broaden and strengthen the identity theft provisions and related statutory provisions—*not* to exclude small businesses from the ambit of the statute. The 2001 amendments in part expanded (1) the type of underlying activity prohibited, to include "obtaining" and "possessing" in addition to "using" or "transferring;" (2) the information and items protected, to include "financial information" in addition to "means of identification;" and (3) the necessary mens rea, from the intent to unlawfully harm or commit a felony to the intent to

14

commit any crime. *See* LAWS OF 2001, ch. 217, § 9(1). Accordingly, the bill was described to the legislature as strengthening the identity theft provisions. *See, e.g.*, H. Floor Debate on Engrossed Substitute S.B. 5449 (Apr. 11, 2001, 10:00 a.m.), at 51 min., 54 sec. Testimony to the legislature in support of the 2001 amendments identified various potential forms of identity theft, including credit card fraud, theft of communication services, banking fraud, and loan fraud—forms of identity theft that clearly and directly threaten small businesses and other corporations as well as natural persons. *See Hearing on S.B. 5449 Before the S. Labor, Commerce, & Fin. Insts. Comm.* (Jan. 29, 2001), at 41 min., 22 sec.—43 min., 40 sec. One witness in support of the amendments emphasized that strengthening the identity theft provisions was important for those who rely on "revolving lines of credit," such as "ranchers and farmers," noting that "in the farming and ranching business, we can ill-afford any more losses." *Id.* at 32 min., 39 sec.—33 min., 44 sec. Further, a representative from the Association of Washington Businesses noted that one of its member businesses had been a victim of identity theft. *Id.* at 1 hr., 4 min., 12 sec. The initial proponent of the bill in the House even opened his remarks by noting that identity theft is "a crime that victimizes both consumers and businesses" and that it was "a growing crime." H. Floor Debate on Substitute H.B. 1250 (Apr. 11, 2001, 10:00 a.m.), at 51 min., 38 sec.; *cf. In re Marriage of Kovacs*, 121 Wn.2d 795, 807-08, 854 P.2d 629 (1993) (noting that the "remarks of . . . a prime sponsor and drafter of the bill" can assist in determining legislative intent). The 2001 amendments were passed

15

unanimously in the House and Senate. LAWS OF 2001, ch. 217. The legislature clearly did not intend to exclude small businesses and other corporations from the protections of the identity theft statute.

The phrase "living or dead" was also added by the 2001 enactment but that phrase was not mentioned or discussed before any committee or on the floor of the House or the Senate. *See S. Labor, Commerce, & Fin. Inst. Comm., supra,* at 1 sec.; *Hearing on Engrossed Substitute S.B. 5449 Before the H. Fin. Insts. & Ins. Comm.* (Mar. 28, 2001), at 26 min., 17 sec.; S. Floor Debate (Mar. 13, 2001, 4:00 p.m.), at 1 hr., 50 min., 42 sec.; H. Floor Debate on Engrossed Substitute H.B. 5449 (Apr. 11, 2001, 10:00 a.m.), at 51 min., 19 sec.; S. Floor Debate (Apr. 16, 2001), at 2 hr., 14 min., 45 sec. The addition of the phrase obviously was meant to clarify that the class of potential victims under the statute was *broader* than what otherwise might have been thought. Numerous federal courts have had to address whether dead persons can be victims under the federal identity theft statute precisely because of the absence of any such clarification. *See United States v. Zuniga-Arteaga,* 681 F.3d 1220 (11th Cir. 2012); *United States v. Maciel-Alcala,* 612 F.3d 1092 (9th Cir. 2010); *United States v. Kowal,* 527 F.3d 741 (8th Cir. 2008); *United States v. Jimenez,* 507 F.3d 13 (1st Cir. 2007). The legislative history shows that the legislature intended to broaden and strengthen the identity theft provisions, in part to protect small businesses and other corporations, and the phrase "living or dead" was meant to ensure a broad rather than a narrow reading of the identity theft statute. It would be unjustifiable in light of the

legislative history to interpret the phrase "living or dead" as narrowing the class of potential victims of identity theft by excluding corporations.

Given the testimony and remarks before the legislature, the types of harms the legislature was seeking to prevent, the context of the prior version of the statute protecting corporations as victims, and the apparent motivation underlying the 2001 amendments, the legislative history clearly establishes that the "living or dead" provision was intended only to ensure a broad scope to the identity theft statute, *not* to exclude corporations as potential victims. Thus, "living or dead" must be interpreted to describe corporations as well as natural persons, both of which are classes of potential victims of identity theft under RCW 9.35.020. The rule of lenity does not apply.

2.     Vagueness

The identity theft statute is not unconstitutionally vague. The mere need for statutory construction does not render a statute unconstitutional. To the contrary, "no more than a reasonable degree of certainty can be demanded," and "one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line." *Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 340, 72 S. Ct. 329, 96 L. Ed. 367 (1952). The identity theft statute gives fair warning that misappropriation of a corporate check with the intent to commit a crime is criminal conduct subject to prosecution, and the statute provides sufficiently objective

standards for purposes of enforcement. Thus, the identity theft statute is not unconstitutionally vague.

a.    *Fair Warning*

The identity theft statute provides the "fair warning" that is required by the due process clause in order to enforce criminal laws. Fair warning is required "so citizens 'may plan their activity accordingly and freely enjoy those activities which are not expressly illegal.'" *Sullivan*, 143 Wn.2d at 181 (quoting *State v. Crediford*, 130 Wn.2d 747, 766, 927 P.2d 1129 (1996) (Sanders, J., concurring)). Although no citizen is likely to review all penal statutes, requiring that penal statutes give fair warning in advance allows for criminal laws to be subjected to general public scrutiny and allows each person to investigate if he or she is unsure about the legality of certain conduct. Thus, a penal statute must "define the criminal offense with sufficient definiteness that ordinary persons can understand what conduct is proscribed," but this test "does not require impossible standards of specificity or absolute agreement because some measure of vagueness is inherent in the use of our language." *Id.* at 181-82.

We have found statutes to be unconstitutionally vague for failure to provide fair warning only in "exceptional cases," *City of Seattle v. Eze*, 111 Wn.2d 22, 28, 759 P.2d 366 (1988), such as when important statutory terms were extremely hazy and remained entirely undefined, *see State v. Williams*, 144 Wn.2d 197, 204-06, 26 P.3d 890 (2001) ("mental health"); *City of Bellevue v. Lorang*, 140 Wn.2d 19, 30, 992 P.2d

496 (2000) ("legitimate communication"); *State v. Richmond*, 102 Wn.2d 242, 244, 683 P.2d 1093 (1984) ("lawful excuse"); *City of Seattle v. Pullman*, 82 Wn.2d 794, 798, 514 P.2d 1059 (1973) ("loitering"), or when prohibited conduct was defined by reference to an ever-changing federal publication not readily available to the public, *see State v. Dougall*, 89 Wn.2d 118, 121-22, 570 P.2d 135 (1977) ("It is unreasonable to expect an average person to continually research the Federal Register to determine what drugs are controlled substances . . . ."), or when an important term involved too many variables and its application would be uncertain in any given case, *City of Seattle v. Rice*, 93 Wn.2d 728, 731-32, 612 P.2d 792 (1980) ("lawful order"). In contrast, we have not found statutes to be unconstitutionally vague simply because of the presence of ambiguity and the need for statutory construction. *See In re Contested Election of Schoessler*, 140 Wn.2d 368, 388-91, 998 P.2d 818 (2000); *State v. Grisby*, 97 Wn.2d 493, 500-02, 647 P.2d 6 (1982); *Yancy*, 92 Wn.2d at 156-57; *Bash*, 130 Wn.2d at 601.

Evans complains about the definition of "person" including corporations only "where relevant," and the need to interpret the phrase "living or dead," and argues that the identity theft statute is unconstitutionally vague as a result. This argument fails because "[t]he fact that a statute requires interpretation does not make it void for vagueness." *Seven Gables Corp. v. MGM/UA Entm't Co.*, 106 Wn.2d 1, 12, 721 P.2d 1 (1986). "Few statutes could withstand a test so strict." *Id.*

The legislature is free to define the term "person" to include corporations "where relevant." The meaning of any given term is allowed to depend on context, including related statutes and underlying legislative purposes. *See State v. Watson*, 160 Wn.2d 1, 8, 11, 154 P.3d 909 (2007); *Haley v. Med. Disciplinary Bd.*, 117 Wn.2d 720, 741, 818 P.2d 1062 (1991) ("If a statute can be interpreted so as to have as a whole the required degree of specificity, then it can withstand a vagueness challenge despite its use of a term which, when considered in isolation, has no determinate meaning."). Further, the concept of relevance is easily understood and applied. *See In re Pers. Restraint of Adolph*, 170 Wn.2d 556, 569 n.1, 243 P.3d 540 (2010) (applying statute allowing the admission of certain records into evidence only "where relevant"). Defining the term "person" to include corporations where relevant provides the "sufficiently definite warning" that due process requires, even if the relevance of corporations may sometimes be relatively uncertain in particular contexts. *Jordan v. De George*, 341 U.S. 223, 231, 71 S. Ct. 703, 95 L. Ed. 886 (1951); *see Eze*, 111 Wn.2d at 27 ("'[I]f men of ordinary intelligence can understand a penal statute, *notwithstanding some possible areas of disagreement*, it is not wanting in certainty.'" (quoting *State v. Maciolek*, 101 Wn.2d 259, 265, 676 P.2d 996 (1984))); *Watson*, 160 Wn.2d at 11 (statute is not unconstitutionally vague so long as "[o]rdinary people need not guess blindly at [its] meaning"); *Maciolek*, 101 Wn.2d at 266 (statute is not unconstitutionally vague "if the general area of conduct against which it is directed is made plain").

Likewise, the need to interpret the phrase "living or dead" does not render the identity theft statute so vague as to be unconstitutional. A statute that is facially ambiguous often still provides fair warning of a broad, reasonable interpretation of the statute. That is why the rule of lenity is applied in favor of the defendant only after considering both plain language *and* legislative history to resolve apparent ambiguities. *See State v. Hirschfelder*, 170 Wn.2d 536, 546, 242 P.3d 876 (2010); *Charles*, 135 Wn.2d at 250 n.4; *Winebrenner*, 167 Wn.2d at 462. The average person is not expected to research legislative history to determine the meaning of a penal statute, but the statute need only give fair warning. The identity theft statute defines the term "person" to include corporations and then denotes potential victims of identity theft as any persons "living or dead," which reasonably could include corporations. Thus, the identity theft statute provides fair warning that corporations are potential victims of identity theft.

The doctrine of unconstitutional vagueness is concerned with inherently hazy or variable (as opposed to merely ambiguous) terms. In this case, the identity theft statute protects any "person, living or dead," and the term "person" includes corporations insofar as they are relevant. The statute makes clear the general area of conduct that is prohibited and the plain language also clearly suggests, even if not definitively, that theft of a corporate identity is included within that prohibition. The mere fact that there are two reasonable interpretations of the statute's plain language—including or excluding corporations as victims—does not render the

21

statute void for vagueness. In sum, the statute provides fair warning that obtaining or using a corporate check with the intent to commit fraud, theft, or any other crime is itself punishable as a crime.

### b.    Arbitrary Enforcement

The identity theft statute also provides sufficiently objective standards for purposes of enforcement. The mere fact that statutory construction is necessary to determine whether corporations are included in the class of victims does not render the statute unconstitutional due to a risk of arbitrary enforcement.

Due process requires criminal statutes to establish workable standards that ensure the law will be enforced "in a nonarbitrary, nondiscriminatory manner." *City of Spokane v. Neff*, 152 Wn.2d 85, 89, 93 P.3d 158 (2004). A lack of objective standards allows "police officers, judge, and jury to subjectively decide what conduct the statute proscribes . . . in any given case." *Maciolek*, 101 Wn.2d at 267. We have found statutes unconstitutionally vague in this regard when they have relied upon "inherently subjective terms" that are amenable to numerous varying and arbitrary interpretations from one case to another. *Id.* (citing cases); *see also, e.g., Neff*, 152 Wn.2d at 91 ("known prostitute"); *Pullman*, 82 Wn.2d at 799 ("loitering").

The identity theft statute does not rely on any such inherently subjective terms—it simply involves a phrase that is ambiguous on its face as between two discrete alternatives but which is resolved by the legislative history of the statute. The statute is limited in its ambiguity prior to construction, establishes objective standards

by which a defendant's guilt can be measured, and once properly construed, is straightforward and unambiguous. The identity theft statute is not unconstitutionally vague.

## IV.   CONCLUSION

We affirm the Court of Appeals and uphold Evans's conviction. The identity theft statute includes corporations as potential victims of identity theft. The statute provides fair warning and establishes objective standards to determine guilt.

González, J.

WE CONCUR:

Madsen, C.J.

Chambers, J.P.T.

Owens, J.

Fairhurst, J.

Stephens, J.

No. 86772-1

WIGGINS, J. (dissenting)—The legislature appropriately limited victims of identity theft to natural persons by using the language "another person, living or dead" in RCW 9.35.020(1) to refer to identity theft victims. Corporations do not live or die but come in and out of existence through the statutorily defined means of incorporation and dissolution. Other statutes that define aspects of life or death refer consistently to natural processes, illustrating that the legislature cannot realistically be said to speak of corporations in metaphors of life or death. Also, several other provisions of the statutory scheme governing identity crimes and pertinent legislative history demonstrate a sustained focus on natural persons, not corporations, as victims of identity theft. Even if the legislature did intend to include corporate victims of identity theft, it did not express that intent clearly. At the very least, the identity theft statute is ambiguous in this regard and requires the application of the rule of lenity in Derrick Robert Evans's favor. This court should reverse the Court of Appeals and vacate Evans's conviction of identity theft for stealing, forging a name on, and cashing a corporate check. I dissent.

DISCUSSION

I. The phrase "person, living or dead" in RCW 9.35.020(1) is meant to exclude corporations

The definition of "person" for the purpose of the identity theft statutes includes corporations only "where relevant." RCW 9A.04.110(17); RCW 9.35.005(4). The

legislature's inclusion of the phrase "another person, living or dead" in RCW 9.35.020(1) in the pertinent provision of the identity theft statute expresses an intent to exclude corporations as not relevant because corporations are neither living nor dead. Life and death are natural processes that do not apply to corporations, irrespective of the occasional analogy or colloquialism present in our case law. This court should reject a reading of RCW 9.35.020(1) that supports the inclusion of corporations as "person[s], living or dead" whose identities are stolen.

A. *The statutes governing corporations do not refer to corporations in terms of being alive or dead*

Corporations exist in Washington only by virtue of the statutes that govern them, whether title 23B RCW, the Washington Business Corporation Act (WBCA), chapter 24.03 RCW, the Washington Nonprofit Corporation Act (WNPCA), or title 35 RCW regarding municipal corporations. These enactments are thus the most appropriate places to determine whether corporations should ever be considered living or dead. Not once in the WBCA, WNPCA, or title 35 RCW are corporations referred to as alive, living, having life, dead, deceased, or having died. Rather, corporations come into existence by incorporation and cease to exist through dissolution.[1] Therefore, they should not be considered living or dead persons under RCW 9.35.020(1).

Business corporations begin their existence by becoming incorporated. RCW 23B.02.030(1) provides that "the corporate existence begins when the articles of incorporation are filed" with the secretary of state. The same is true of nonprofit

---

[1] Municipal corporations cease to exist through disincorporation. *See* RCW 35.07.010, .020.

2

corporations. *See* RCW 24.03.150. Unless the articles of incorporation provide otherwise, for-profit and nonprofit corporations have "perpetual existence and succession in [their] corporate name." RCW 23B.02.020(3)(c); RCW 23B.03.020(1); *see also* RCW 24.03.035(1). Thus, corporations remain incorporated, not living. They come into existence not by being alive, but upon the filing of a specific document with the secretary of state.

During their existence, corporations do not possess the independence of living beings. Rather, "[a]ll corporate powers [are] exercised by or under the authority of the corporation's board of directors." RCW 23B.08.010(2)(a); *see also* RCW 24.03.095 ("The affairs of a [nonprofit] corporation shall be managed by a board of directors."). Similarly, corporate affairs are "managed under the direction of [a corporation's] board of directors, which [has] exclusive authority as to substantive decisions concerning management of the corporation's business." RCW 23B.08.010(2)(b). A corporation is entirely controlled by its board of directors rather than by its own choices or instincts. In this way, corporations are also distinct from living persons.

Given their perpetual existence, corporations do not die. Instead, someone must dissolve them. Dissolution of business corporations typically occurs in one of two ways. First, the corporation's board of directors "may propose dissolution for submission to the shareholders." RCW 23B.14.020(1). Two-thirds of the authorized shareholders then must approve the proposed dissolution. RCW 23B.14.020(5). Second, the secretary of state has the power to administratively dissolve corporations for failure to pay license fees, to deliver the initial or annual report to

3

the secretary of state, or to maintain a registered agent. RCW 23B.14.200(1)–(3). Similarly, nonprofit corporations are dissolved voluntarily by a vote of the members or resolution of the board of directors, RCW 24.03.220(1)–(2), or involuntarily by decree of the superior court, RCW 24.03.250, .266. Corporate dissolution that occurs at the vote of shareholders or directors, or by the hand of the secretary of state or a superior court judge, does not remotely resemble death. After all, even upon dissolution, a corporation "continues its corporate existence . . . to wind up and liquidate its business and affairs." RCW 23B.14.050(1); *see also* RCW 24.03.245.[2] This can hardly be said of living beings after they die.

Neither can municipal corporations be conceived of as living or dead. Municipal corporations are incorporated when a majority of the votes cast by residents favor incorporation. RCW 35.02.120. During its existence, a municipal corporation is run by a commission consisting of a mayor, a commissioner of finance and accounting, and a commissioner of streets and public improvements, RCW 35.17.010, that "determine[s] what powers and duties are to be performed in each department, . . . prescribe[s] the powers and duties of the various officers and employees and make[s] such rules and regulations for the efficient and economical conduct of the business of the city . . . ." RCW 35.17.090. "Cities and towns may disincorporate," RCW 35.07.010, upon a petition for disincorporation signed by a majority of registered voters, RCW 35.07.020. A receiver is then appointed to wind

---

[2] Various other corporate entities exist under title 24 RCW, such as corporations sole, fraternal societies, and granges. But it is unnecessary to discuss each different type of corporation because these entities, like for-profit and nonprofit corporations, are formed through the signing of incorporation documents. They are not born, they are not living, and they do not die.

4

up affairs. RCW 35.07.150. Like business and nonprofit corporations, municipal corporations cannot under any stretch of the imagination be considered living or dead.

The majority grasps at straws to demonstrate that corporations may be considered living or dead for the purpose of the identity theft statute, devoting some two pages of its opinion to citing instances where this court and other courts have metaphorically referred to corporations as such. *See* majority at 9-10. While courts might use analogies to describe business organizations on occasion, the fact that the statutes governing corporations do not speak in terms of life or death undermines the majority's reading of RCW 9.35.020(1) to include corporations within a class of "person[s], living or dead." The more appropriate reading of RCW 9.35.020(1) limits the victims of identity theft to natural beings.

B. *Where the legislature elsewhere defines life or death, it refers to the natural processes of natural beings*

In other statutes, the legislature has defined words such as "living" or "dead" to refer solely to the functions of natural beings. For the purposes of the criminal mistreatment chapter, chapter 9A.42 RCW, the legislature has defined the "'[b]asic necessities of life'" as "food, water, shelter, clothing, and medically necessary health care . . . ." RCW 9A.42.010(1). This definition of life's necessities only contemplates that natural beings are alive and clearly excludes corporations. Similarly, statutes regarding indigent defense services provide that "'[b]asic living costs' means the average monthly amount spent by the defendant for reasonable payments toward living costs, such as shelter, food, utilities, health care, transportation, clothing, loan

5

payments, support payments, and court-imposed obligations." RCW 10.101.010(2)(d). This reference to "living costs" demonstrates a legislative understanding that only natural beings, not business organizations, are alive.

Other statutes clarify that death too is intended to refer to the natural occurrence experienced by living beings. In the personal property statutes, an "[i]ndividual" is defined as a "natural person, living or dead," RCW 63.60.020(4), and a "'[d]eceased individual' means any individual . . . who has died within ten years before January 1, 1998, or thereafter," RCW 63.60.020(1). The term "fetal death" is defined in the vital statistics chapter as "any product of conception that shows no evidence of life after complete expulsion or extraction from its mother." RCW 70.58.150. "'Evidence of life,'" by contrast, "include[s] breathing, beating of the heart, pulsation of the umbilical cord, or definite movement of voluntary muscles." *Id.* These statutes employing death in definitions provisions refer only to living beings that experience the natural, inevitable process of death.

These examples illustrate that the legislature does not tend to use metaphors of life or death to refer to inanimate objects or organizations. Rather, its uses of words like "living" or "dead" refer to the natural processes of living organisms. These references call into serious doubt any interpretation of "person, living or dead" in RCW 9.35.020(1) that includes nonliving, inanimate objects such as corporations.

II. Several other sections of the identity theft chapter indicate the legislature's intent to exclude corporations as victims of identity theft

In addition to the phrase "living or dead" in RCW 9.35.020(1), other provisions of the identity crimes scheme of chapter 9.35 RCW strongly suggest that the legislature did not intend to make corporations the direct victims of identity theft.

RCW 9.35.030(1) makes it "unlawful for any person to knowingly use a means of identification or financial information of another person to solicit undesired mail with the intent to annoy, harass, intimidate, torment, or embarrass that person." Corporations, being inanimate and unfeeling, are incapable of being annoyed, harassed, intimidated, tormented, or embarrassed. It seems odd that the legislature would have included corporations in the definition of "another person, living or dead" to make them victims of identity theft but would have excluded them in the very next section of chapter 9.35 RCW from being victims of undesired mail solicitation.

The legislature has also defined "victim" for the purposes of the identity crimes chapter and has provided victims with a way to obtain information from businesses who may have entered a transaction with a perpetrator of identity theft.[3] But in order for victims to obtain this information, the statute requires victims to provide "proof of positive identification," including "[t]he showing of a government-issued photo identification card . . . ." RCW 9.35.040(2)(a). Victims must also provide a "written statement from the state patrol showing that the state patrol has

---

[3] RCW 9.35.005(5) defines "'victim'" as "a person whose means of identification or financial information has been used or transferred with the intent to commit, or to aid or abet, any unlawful activity." RCW 9.35.040(1) requires persons or businesses "possessing information relating to an actual or potential violation of this chapter, and who may have entered into a transaction . . . with a person who has used the victim's means of identification" to "provide [to the victim] copies of all . . . transaction information related to the transaction being alleged as a potential or actual violation of this chapter."

on file documentation of the victim's identity pursuant to the personal identification procedures in RCW 43.43.760." RCW 9.35.040(2)(c). RCW 43.43.760(1) and (2) contain procedures for victims to request and obtain "an impression of [their] *fingerprints*." (Emphasis added.) Needless to say, corporations have no fingerprints or government-issued photo identification cards. Had the legislature intended corporations to be victims of identity theft, it would not have excluded corporations from the only provision of chapter 9.35 RCW that assists victims in investigating and preventing occurrences of identity theft.

In short, other provisions of chapter 9.35 RCW demonstrate that the legislature intended only natural beings to be victims of identity theft.

III. <u>The statutory and legislative history also point to the exclusion of corporate victims of identity theft</u>

The various amendments to chapter 9.35 RCW and related legislative history support the exclusion of corporate victims of identity theft. When the legislature enacted these statutes, and each time it has revisited them, it has remained focused on natural persons, not business associations, as the victims of identity theft.

*A. 1999 Statute*

Under the original identity theft statute enacted in 1999, it appears that the legislature did intend to include businesses in the definition of person, at least as persons capable of perpetrating the crime of identity left. *See* LAWS OF 1999, ch. 368, § 2 ("If the *person* violating this section is a *business* that repeatedly violates this section, that *person* also violates the consumer protection act, chapter 19.86 RCW." (emphasis added)); *see also* 1999 FINAL LEGISLATIVE REPORT, 56th Wash.

Leg., at 49. But while businesses may have qualified as perpetrators of identity theft, there is no indication that they qualified as victims. The original statute prohibited a person from "knowingly us[ing] or knowingly transfer[ring] a means of identification of another person with the intent to commit . . . any felony." LAWS OF 1999, ch. 368, § 3. In defining the "'means of identification'" of a person, the legislature included the "electronic address or identifier of the individual or any member of his or her *family*, including the *ancestor of such person*." *Id.* (emphasis added). These references to an individual's family and ancestors suggest that the legislature did not consider corporations when it defined "means of identification."

In the House bill report on Substitute H.B. 1250, the summary of the testimony supporting the bill noted that "[i]t is important that identity theft be defined as a separate crime; often the merchant or the financial institution suffers the loss and the person whose identity is stolen to commit these acts is not considered a victim by law enforcement." H.B. REP. on Substitute H.B. 1250, 56 Leg., Reg. Sess., at 2 (Wash. 1999). This portion of the report acknowledges that businesses are harmed by identity theft but seems to consider the interests of businesses separately from the interests of direct victims whose identities are stolen.

In sum, the 1999 statute and accompanying legislative history may contemplate businesses as persons who perpetrate the crime of identity theft, but not as direct identity theft victims. The 1999 enactment and legislative history thus cannot be read as clearly including corporations as identity theft victims.

*B. 2001 Amendments*

In 2001, the legislature revamped the identity theft statutes, inserting new provisions in the identity crimes chapter, chapter 9.35 RCW, that included definitions of "person" and "victim." LAWS OF 2001, ch. 217, § 1(4)–(5). As discussed above, these definitions were accompanied by provisions that suggested an intent to limit the victims of identity theft to natural persons. The legislative history confirms that the legislature appeared concerned only about consumer victims, not corporate victims, of identity theft.

The 2001 amendments resulted from a consumer privacy task force formed by the Washington State Attorney General. *See* 2001 FINAL LEGISLATIVE REPORT, 57th Wash. Leg., at 198; S.B. REP. on Engrossed Substitute S.B. 5449, 57th Leg., Reg. Sess., at 1 (Wash. 2001). The Attorney General task force concluded that incidences of identity theft were growing so quickly that "victims need[ed] help in obtaining information to reestablish their identity, deal with creditors, and help assist law enforcement." 2001 FINAL LEGISLATIVE REPORT, *supra*, at 198.

With this focus in mind, the legislature enacted several provisions involving fingerprints and photo identifications, discussed above, that provided a way for identity theft victims to obtain information and gain protection from businesses who had transacted with perpetrators of identity theft. This concern prompted the legislature to clearly place "victims" of identity theft on one side of a transaction and "businesses" on the other. For example, the House bill report notes that "business was quite sensitive to the needs and concerns of victims and the bill strikes a balance between the interests of the two groups. Both victims and businesses are

protected." H.B. REP. on Engrossed Substitute S.B. 5449, 57th Leg., Reg. Sess., at 5 (Wash. 2001). Similarly, opponents of the bill noted concerns that it "creates disproportionate and inappropriate penalties for one of the *other victims of identity theft—businesses.*" S.B. REP. on Engrossed Substitute S.B. 5449, 57th Leg., Reg. Sess., at 3 (Wash. 2001) (emphasis added). These portions of the legislative history strongly demonstrate that the legislature was concerned with protecting natural persons as direct victims of identity theft and with protecting businesses as indirect victims, but that these were two distinct groups in need of distinct protections.

The majority contends that the "living or dead" language added to the identity theft statute should support a broad reading of the new amendments that includes corporations. *See* majority at 16-17. But the insertion of "living or dead" in RCW 9.35.020(1) is consistent with the legislative history that shows that the legislature was focused on natural persons only as identity theft victims. The fact that the legislature distinguished between businesses and victims in its internal reports and memoranda indicates that the legislature was making a similar distinction in the text of the statute.

The majority also unconvincingly relies on witnesses who testified in support of the 2001 amendments, as well as on comments of the "initial proponent" of the bill. *See* majority at 15-16. Such testimony and comments are simply not good indicators of legislative intent. As the United State Supreme Court has admonished, relying on such testimony gives "unrepresentative committee members—or, worse yet, unelected staffers and lobbyists—both the power and the incentive to attempt strategic manipulations of legislative history to secure results they were unable to

achieve through the statutory text." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568, 125 S. Ct. 2611, 162 L. Ed. 2d 502 (2005); *cf. Snow's Mobile Homes, Inc. v. Morgan*, 80 Wn.2d 283, 291, 494 P.2d 216 (1972) ("While statements and opinions of individual legislators generally are not considered by the courts in construing legislation, statements made in answer to questions on the floor by the chairman of the committee in charge of the bill may be taken as the opinion of the committee as to the meaning of the bill."). The majority's reliance on lay testimony and the comments of certain legislators does not sufficiently demonstrate the legislature's clear intent to include corporations as victims of identity theft.

Contrary to the majority's assertion that the 2001 amendments demonstrate legislative intent to include corporations as potential victims of identity theft, majority at 17, the 2001 legislation points in the other direction. The 2001 amendments and connected legislative history do not support a reading of the identity theft statute that includes corporate victims of identity theft, as discussed above.

### C. 2004 and 2008 Amendments

The legislature again revised the identity theft statutes in 2004 and 2008.[4] On both occasions, the legislature added language that appears inconsistent with the inclusion of corporations as victims of identity theft.

In 2004, the legislature enacted a biometric matching system to reduce fraudulent issuances of driver's licenses and state identification cards. LAWS OF 2004, ch. 273, § 1. The legislature indicated that "[t]he most common method of

---

[4] The legislature also amended the identity theft statutes in 2003, but only "to reorganize criminal provisions . . . to clarify and simplify the identification and referencing of crimes." LAWS OF 2003, ch. 53, § 1.

accomplishing identity theft . . . is by securing a fraudulently issued driver's license." *Id.* In light of this concern, the legislature ordered the Department of Licensing to create a biometric matching system to "allow every person applying for an original, renewal, or duplicate driver's license or identicard the option of submitting a biometric identifier." 2004 FINAL LEGISLATIVE REPORT, 58th Wash. Leg., at 120. Given the focus on biometric data to prevent identity theft, the legislature was again concerned only with natural persons as victims of identity theft.

In 2008, the legislature again revised the identity theft statutes to allow a "person who has learned or reasonably suspects that his or her financial information or means of identification has been unlawfully obtained" to obtain a police incident report. LAWS OF 2008, ch. 207, § 2. The final legislative report pointed out that "identity theft victims must have police reports to freeze their credit, to place long-term fraud alerts on credit reports, and to obtain records of fraudulent accounts from merchants." 2008 FINAL LEGISLATIVE REPORT, 60th Wash. Leg., at 171. The legislative history also discloses that the amendment requiring a police report was partially responsive to a Federal Trade Commission survey showing that 19 percent of persons surveyed indicated that police refused to take their report of identity theft. *Id.* The focus on consumers obtaining a police report again demonstrates that the legislature viewed natural persons, not corporations, as the direct victims of identity theft.

From 1999 to 2008, the legislature enacted or amended identity theft laws with a focus on everyday consumers—i.e., natural persons—who were victimized by identity theft. This belies the majority's holding that the legislature intended to

13

include corporations as identity theft victims. We should interpret RCW 9.35.020(1) as excluding corporations from the class of persons victimized by identity theft.

IV.   At the very least, the identity theft statute is ambiguous, requiring the application of the rule of lenity

Even if the legislature did intend to include corporations as victims of identity theft, it did not do so clearly enough to support criminal liability in this case. "'[W]hen choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite. We should not derive criminal outlawry from some ambiguous implication.'" *State v. Tvedt*, 153 Wn.2d 705, 711, 107 P.3d 728 (2005) (quoting *United States v. Universal C.I.T. Credit Corp.*, 344 U.S., 218, 221-22, 73 S. Ct. 227, 97 L. Ed. 260 (1952)). If a criminal statute "is susceptible to more than one reasonable interpretation, it is ambiguous and, absent legislative intent to the contrary, the rule of lenity requires us to interpret the statute in favor of the defendant." *State v. Coucil*, 170 Wn.2d 704, 706-07, 245 P.3d 222 (2010) (citing *State v. Jacobs*, 154 Wn.2d 596, 600-01, 115 P.3d 281 (2005)).

Assuming for the sake of argument that it is reasonable to interpret the identity theft statute as including corporations within the class of victims, the statute is susceptible to two reasonable interpretations—one that includes corporate victims and one that does not. This renders the statute ambiguous. The rule of lenity would thus apply, requiring that we interpret the identity theft statute in Evans's favor. For

this reason as well, RCW 9.35.020 must be interpreted to exclude corporations as victims of identity theft.

CONCLUSION

The text of RCW 9.35.020(1) and of other provisions of the identity crimes statutes of chapter 9.35 RCW supports a conclusion that the legislature did not intend to include corporations as identity theft victims. Tracking the amendments to the identity theft statutes and related legislative history indicates that corporations were excluded from identity theft victimhood. And even if the legislature did intend to include corporations, both interpretations of the statute would be reasonable making the statute ambiguous and the rule of lenity applicable in Evans's favor. I would reverse the Court of Appeals and vacate Evans's conviction.

I dissent.

Wiggins, J.