IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| CERTIFICATION FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF WASHINGTON IN | ) ) ) ) ) |  No. 102592-1  En Banc |
| ROXANN BROWN and MICHELLE SMITH, on their own behalf and on behalf of others similarly situated, | ) ) ) ) | Filed: <u>April 17, 2025</u> |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| OLD NAVY, LLC; OLD NAVY (APPAREL), LLC; OLD NAVY HOLDINGS, LLC; GPS SERVICES, INC.; and THE GAP, INC., inclusive, | ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

GONZÁLEZ, J.—The Washington State legislature passed a law making it illegal to send commercial e-mails with false or misleading information in their subject lines. The statute's language is plain: "No person may initiate the transmission . . . of a commercial electronic mail message . . . [to] a Washington resident that: . . . (b) [c]ontains false or misleading information in the subject line."

RCW 19.190.020(1). We are asked whether this statute prohibits *any* false or misleading information in subject lines or only false or misleading information about the commercial nature of the message. We conclude that the statute prohibits the use of any false or misleading information in the subject line of a commercial e-mail.

### BACKGROUND

Roxann Brown and Michelle Smith sued the retailer Old Navy after receiving e-mails with subject lines that they say contained false or misleading information regarding the duration of Old Navy's promotions, violating the "Commercial Electronic Mail Act" (CEMA). A federal court has asked us to answer a certified question about CEMA.

CEMA was enacted in 1998, during the Internet's dial-up era, to address "an increasing number of consumer complaints about commercial electronic mail." LAWS OF 1998, ch. 149, § 1. The legislature was specifically concerned about the growing "volume" of commercial e-mails. *Id.* When CEMA was originally passed, Internet access was comparatively slow and expensive. Consumers often paid for access "by the minute or hour." *State v. Heckel*, 143 Wn.2d 824, 835, 24 P.3d 404 (2001). The legislature was concerned about the added cost consumers faced when a barrage of commercial e-mails meant that they paid internet providers for time spent sifting through in-boxes cluttered by spam. *See* FINAL B. REP. ON ENGROSSED

SUBSTITUTE H.B. 2752, at 1, 55th Leg., Reg. Sess. (Wash. 1998) ("Many consumers connect to the Internet through interactive computer services that charge fees for time spent utilizing a dial-up connection to their computer servers."); *see also* S.B. REP. ON ENGROSSED SUBSTITUTE H.B. 2752, at 1, 55th Leg., Reg. Sess. (Wash. 1998) ("The sending of e-mail messages uses resources of recipients. Many consumers connect to the Internet through interactive computer services that charge in increments of time so that recipients must pay to download these messages."). While the legislature has amended CEMA several times since its enactment, it has never revised RCW 19.190.020(1)(b).

A single sentence captures two of CEMA's e-mail regulations.[1] CEMA prohibits sending Washington residents "a commercial electronic mail message" that misrepresents the sender's identity. RCW 19.190.020(1)(a). CEMA defines a "commercial electronic mail message" as "an electronic mail message sent for the purpose of promoting real property, goods, or services for sale or lease." RCW 19.190.010(2). The definition of the term commercial electronic mail message and

---

[1] No person may initiate the transmission, conspire with another to initiate the transmission, or assist the transmission, of a commercial electronic mail message from a computer located in Washington or to an electronic mail address that the sender knows, or has reason to know, is held by a Washington resident that:
(a) Uses a third party's internet domain name without permission of the third party, or otherwise misrepresents or obscures any information in identifying the point of origin or the transmission path of a commercial electronic mail message; or
(b) Contains false or misleading information in the subject line.

RCW 19.190.020(1).

its use in RCW 19.190.020 means that this statute applies only to commercial e-mails.

A violation of CEMA's e-mail regulations is a per se violation of the Consumer Protection Act (CPA). *See* RCW 19.190.030(1), .100; ch. 19.86 RCW. CEMA sets a $500 penalty for sending Washington residents commercial e-mails that violate its regulations. RCW 19.190.040. Unlike the CPA, CEMA's $500 penalty does not require a showing of actual damages. *Cf.* RCW 19.86.090. Under CEMA, the injury is receiving an e-mail that violates its regulations. While the CPA broadly outlaws "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," RCW 19.86.020, CEMA distinctly outlaws sending commercial e-mails that contain false or misleading information in subject lines.

Plaintiffs allege that Old Navy violated RCW 19.190.020(1)(b) when it sent them e-mails that, for example, announced that a 50 percent off promotion was ending even though the retailer continued to offer the 50 percent off promotion in the days following the initial e-mail. Other examples include e-mails that announced time-limited promotions (e.g. "today only" or "three days only") that were extended beyond the specified time limit. Smith and Brown categorize the e-mails containing allegedly false or misleading subject lines into four types: e-mails that announced offers that were available for longer than the time stated in the

subject line, e-mails that falsely suggested an old offer was new, e-mails that falsely suggested an offer was ending, and e-mails that falsely stated a promotion was extended. Plaintiffs claim that Old Navy used false or misleading information in the subject lines to get consumers to open the e-mails and "make purchases based on a false sense of urgency." Pls.' Answering Br. on Certified Question at 6.

No state court has addressed the scope of RCW 19.190.020(1)(b). In *Weimin Chen v. Sur La Table, Inc.*, a federal court recently held that subsection (1)(b) "specifically prohibits false and misleading information *as to the nature of the email*, i.e. that the email is an advertisement." *Chen v. Sur La Table, Inc.*, 655 F. Supp. 3d 1082, 1092 (W.D. Wash. 2023) (emphasis added). Old Navy, supported by amici curiae Retail Litigation Center and the Washington Retail Association, asks that we follow *Chen*. But we are not bound by federal courts' interpretation of our state laws. *See In re Elliott*, 74 Wn.2d 600, 602, 446 P.2d 347 (1968) (plurality opinion); *Fed. Home Loan Bank of Seattle v. Credit Suisse Sec. (USA) LLC*, 194 Wn.2d 253, 268-69, 449 P.3d 1019 (2019). The attorney general, as amicus curiae, asks that we reject Old Navy's interpretation of subsection (1)(b).

## CERTIFIED QUESTION

Does RCW 19.190.020(1)(b) prohibit the transmission of a commercial email with a subject line containing *any* false or misleading information, or is the prohibition limited to subject lines containing false or misleading information *about the commercial nature of the email message*?

*Brown v. Old Navy, LLC*, No. 102592-1

Order Certifying Question to Wash. State Sup. Ct., *Brown v. Old Navy, LLC*, No. 2:23-cv-00781-JHC, at 3 (W.D. Wash. Nov. 29, 2023).

## ANALYSIS

We review certified questions de novo. *Wright v. Lyft, Inc.*, 189 Wn.2d 718, 722, 406 P.3d 1149 (2017) (citing *Parents Involved in Community Schs. v. Seattle Sch. Dist. No. 1*, 149 Wn.2d 660, 670, 72 P.3d 151 (2003)). We have broad discretion in deciding how to answer a certified question. *Convoyant LLC v. DeepThink, LLC*, 200 Wn.2d 72, 74, 514 P.3d 643 (2022). We consider the legal issues presented based on the certified record provided by the federal court. *Peoples v. United Servs. Auto. Ass'n*, 194 Wn.2d 771, 777, 452 P.3d 1218 (2019) (citing *Bradburn v. N. Cent. Reg'l Libr. Dist.*, 168 Wn.2d 789, 799, 231 P.3d 166 (2010)).

We also review questions of statutory interpretation de novo. *Velazquez Framing, LLC v. Cascadia Homes, Inc.*, 2 Wn.3d 552, 554-55, 540 P.3d 1170 (2024) (citing *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002)). Statutory interpretation begins with a statute's plain meaning. *Lake v. Woodcreek Homeowners Ass'n*, 169 Wn.2d 516, 526, 243 P.3d 1283 (2010). Our fundamental objective when interpreting statutes "is to ascertain and carry out the Legislature's intent, and if the statute's meaning is plain on its face, then th[is] court must give effect to that plain meaning as an expression of legislative intent."

*Campbell & Gwinn*, 146 Wn.2d at 9-10. "Plain meaning 'is to be discerned from the ordinary meaning of the language at issue, the context of the statute in which that provision is found, related provisions, and the statutory scheme as a whole.'" *Lake*, 169 Wn.2d at 526 (quoting *State v. Engel*, 166 Wn.2d 572, 578, 210 P.3d 1007 (2009)). While we may look for guidance in the statutory context, we "must not add words where the legislature has chosen not to include them." *Rest. Dev., Inc. v. Cananwill, Inc.*, 150 Wn.2d 674, 682, 80 P.3d 598 (2003). We must also construe statutory language in a manner that gives "'all the language used'" effect, without rendering any portion of the statute "'meaningless or superfluous.'" *Davis v. Dep't of Licensing*, 137 Wn.2d 957, 963, 977 P.2d 554 (1999) (quoting *Whatcom County v. City of Bellingham*, 128 Wn.2d 537, 546, 909 P.2d 1303 (1996)). Importantly, "[w]e construe remedial consumer protection statutes . . . liberally in favor of the consumers they aim to protect." *Jametsky v. Olsen*, 179 Wn.2d 756, 765, 317 P.3d 1003 (2014).

If a statute "is clear on its face," then it "is not subject to judicial construction." *State v. J.M.*, 144 Wn.2d 472, 480, 28 P.3d 720 (2001) (citing *State v. Chapman*, 140 Wn.2d 436, 450, 998 P.2d 282 (2000)); *see also State v. Evans*, 177 Wn.2d 186, 192, 298 P.3d 724 (2013) ("Plain language that is not ambiguous does not require construction." (citing *State v. Delgado*, 148 Wn.2d 723, 727, 63 P.3d 792 (2003))). "If the statute is unambiguous after a review of the plain

meaning, the court's inquiry is at an end." *State v. Gray*, 174 Wn.2d 920, 927, 280 P.3d 1110 (2012).

When a statute is subject to more than one reasonable interpretation, we engage in statutory construction and "'look to the legislative history of the statute and the circumstances surrounding its enactment to determine legislative intent.'" *Lake*, 169 Wn.2d at 527 (quoting *Rest. Dev.*, 150 Wn.2d at 682); *see also Evans*, 177 Wn.2d at 192-93. Nonetheless, a statute is not ambiguous and thus not subject to judicial construction "'merely because different interpretations are conceivable.'" *Gray*, 174 Wn.2d at 927 (internal quotation marks omitted) (quoting *Est. of Haselwood v. Bremerton Ice Arena, Inc.*, 166 Wn.2d 489, 498, 210 P.3d 308 (2009)). Ambiguity "must arise from the language of the statute itself, not from considerations outside the statute." *Cerrillo v. Esparza*, 158 Wn.2d 194, 203-04, 142 P.3d 155 (2006).

While interpreting statutes, we strive to avoid absurd results and we assume that the legislature meant what it said. "'Although the court should not construe statutory language so as to result in absurd or strained consequences, neither should the court question the wisdom of a statute even though its results seem unduly harsh.'" *In re Custody of Smith*, 137 Wn.2d 1, 8, 969 P.2d 21 (1998) (quoting *Duke v. Boyd*, 133 Wn.2d 80, 87, 942 P.2d 351 (1997)). Nonetheless, we have explained that the "absurd results" canon of construction "must be applied

sparingly" because this approach "refuses to give effect to the words the legislature has written; it necessarily results in a court disregarding an otherwise plain meaning and inserting or removing statutory language, a task that is decidedly the province of the legislature." *Five Corners Fam. Farmers v. State*, 173 Wn.2d 296, 311, 268 P.3d 892 (2011).

1.  The plain meaning of RCW 19.190.020(1)(b)

In Washington, individuals and entities like Old Navy cannot send a commercial e-mail that "[c]ontains false or misleading information in the subject line." RCW 19.190.020(1)(b). We have suggested that commercial e-mails containing false or misleading subject lines "such as "Hi There!," "Information Request," and "Your Business Records"'" probably violate RCW 19.190.020(1)(b). *Heckel*, 143 Wn.2d at 835 (quoting Hr'g on H.B. 2752 Before the Wash. H. Comm. on Energy & Utils. (Jan. 28, 1998) (testimony of Ed McNichol)). But we have not addressed whether the prohibition encompasses any false or misleading information or merely false or misleading information about the commercial nature of the e-mail. Nonetheless, we have regarded the dual prohibitions of RCW 19.190.020(1) as CEMA's "'truthfulness requirements'" and explained that together they mean "[s]pammers must use an accurate, nonmisleading subject line, and they must not manipulate the transmission path to disguise the origin of their commercial messages." *Id.* at 836 (quoting Jack L.

Goldsmith & Alan O. Sykes, *The Internet and the Dormant Commerce Clause*, 110 YALE L.J. 785, 819 (2001)). In *State v. Heckel*, the Court of Appeals suggested that deciding whether a subject line is misleading requires evaluating "the subject line alone" because CEMA "does not regulate the body of the e-mail, only the subject line." 122 Wn. App. 60, 71, 93 P.3d 189 (2004). We agree. We recognize that in *Heckel*, the Court of Appeals also concluded that Heckel violated CEMA "by enticing the recipient to believe that the message might be from a friend or acquaintance or business contact . . . rather than a commercial advertisement." *Id.* We conclude, however, that subsection (1)(b) is broader than that.

We begin with the statute's plain meaning. *Lake*, 169 Wn.2d at 526. Plaintiffs argue that under the plain language of subsection (1)(b), a commercial e-mail may not contain false or misleading information in the subject line. Old Navy argues that read in context of other provisions of CEMA and the CPA, subsection (1)(b) prohibits false or misleading information only about the commercial nature of the commercial e-mail. It notes that the CPA "banned false or misleading marketing *in any medium*" before CEMA was ever enacted and that plaintiffs' interpretation would render CEMA absurd and superfluous. Opening Br. on Certified Question for Defs. at 24.

First, Old Navy urges that when read in context with subsection (1)(a), subsection (1)(b) is "directed at statements in the subject line that mislead

recipients as to the *subject* of the email." Defs.' Reply Br. at 5. In other words, "deception about . . . *what* the email is about." *Id.* at 6. Plaintiffs respond that defendants' interpretation would require us to impermissibly add words to the statute. We agree with plaintiffs. To violate subsection (1)(b), an e-mail subject line does not need to deceive consumers about the subject or purpose of the e-mail—it merely needs to contain false or misleading information. This means that a commercial e-mail violates subsection (1)(b) even when the false or misleading information in the subject line does not deceive consumers about the advertising purpose or commercial nature of the e-mail.

We evaluate a statute's plain meaning by looking to "'the ordinary meaning of the language at issue, the context of the statute in which that provision is found, related provisions, and the statutory scheme as a whole.'" *Lake*, 169 Wn.2d at 526 (quoting *Engel*, 166 Wn.2d at 578). RCW 19.190.010(2) defines a commercial electronic mail message as an e-mail "sent for the purpose of promoting real property, goods, or services for sale or lease." Subsection (1)(b) prohibits false or misleading information in the subject lines of e-mails *sent for a commercial purpose*. RCW 19.190.020(1)(b). The incorporation of the term defined by RCW 19.190.010(2) into the prohibition of RCW 19.190.020(1)(b) shows that the statute was designed to regulate e-mails sent for a commercial purpose.  Here, the interpretation offered by Old Navy is precluded by the term defined in RCW

19.190.010(2). Furthermore, the language of subsection (1)(b) is patently clear. Old Navy's attempt at reading subsections (1)(a) and (1)(b) together to ascertain a distinct meaning fails to persuade us that subsection (1)(b) does not mean exactly what it says.

Second, while Old Navy concedes that the legislature intended to prevent spammers from using false or misleading subject lines to trick people into opening spam, it argues that subsection (1)(b) was not created as an "enhanced anti-fraud provision" that encompasses only the commercial e-mail's subject line. Opening Br. on Certified Question for Defs. at 20. Old Navy argues that when read in context, subsection (1)(b) simply imposes a disclosure requirement and a ban on disguising e-mail information "so that a recipient would be more likely to open an unwanted advertisement." *Id.* at 15. We disagree.

CEMA sought to give consumers relief from commercial spam e-mail by requiring accuracy and truthfulness in the subject lines of such e-mails. The legislature sought to achieve this objective by targeting an e-mail's header and subject lines: the two pieces of information consumers first glean when faced with the choice of deleting a message or engaging with its content. In short, the method employed by the legislature in subsection (1)(b) to achieve the goals of CEMA is precise and appropriate, and thus Old Navy's argument that CEMA did not

distinctly focus on truthfulness in the subject lines of commercial e-mails is unpersuasive.

Similarly, Old Navy urges that CEMA is concerned with specific electronic practices unique to e-mails and "not fraudulent conduct *in general* that happens to be carried out over those messages." *Id.* at 23. It argues that "the Legislature made no indications that it intended to elevate the penalties of fraudulent inducement *generally* when it happens to be carried out over the internet." *Id.* But like the argument above, this point ignores the legislature's choice to focus on the subject lines of commercial e-mails in an attempt to address a deluge of commercial spam.

Third, Old Navy argues that plaintiffs' interpretation would render subsection (1)(b) superfluous and absurd given that the CPA already "banned false or misleading marketing *in any medium*." *Id.* at 24. Old Navy contends plaintiffs' interpretation would create an absurd "two-tier system where a fraudulent statement in the subject line violates CEMA and attaches statutory damages while the *same* statement in the body of the e-mail would violate the CPA but only award actual damages." *Id.* at 25. We disagree.

The CPA and CEMA focus on different, admittedly overlapping, things. The CPA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." RCW 19.86.020. CEMA, by contrast, targets a specific deceptive commercial practice: sending Washington

13

residents commercial e-mails that contain "false or misleading information in the subject line[s]." RCW 19.190.020(1)(b). The legislature understood that these two statutes work together: it made CEMA violations per se CPA violations. *See* RCW 19.190.030(1), .100. As the attorney general's amicus brief explains, "Per se CPA violations are predicated on the Legislature's recognition that certain conduct is categorically against the public interest." Br. of Amicus Curiae Att'y Gen. of State of Wash. at 4 (citing *Indoor Billboard/Wash., Inc. v. Integra Telecom of Wash., Inc.*, 162 Wn.2d 59, 79, 170 P.3d 10 (2007)). In short, Old Navy's argument that plaintiffs' interpretation renders the CPA superfluous is unpersuasive.

Old Navy also contends that it would be absurd to interpret subsection (1)(b) as to give statutory damages for a false statement in a subject line because the same statement in the body of the e-mail would warrant only actual damages under the CPA. In effect, Old Navy is arguing that focusing on the subject line leads to absurd results. But the legislature was targeting a particular type of deceptive commercial activity in RCW 19.190.020(1)(b)—sending commercial e-mails with false or misleading subject lines. The legislature concluded that statutory damages was an appropriate and effective means of combating commercial spam e-mails. *See Heckel*, 143 Wn.2d at 836-37. Accordingly, CEMA does not require a showing of injury for statutory damages to be awarded because the injury is receiving the e-

14

mail that violates CEMA. There is nothing absurd about CEMA's focus on subject lines or CEMA's allocation of statutory damages to falsity in the subject lines.

Relatedly, Old Navy seems to argue that it would be absurd to expose Old Navy to liability under CEMA if it violated CEMA's truthfulness requirements because the liability is costly and because the body of the e-mail is unregulated by CEMA. This argument is unpersuasive. There is nothing absurd about holding defendants liable for violating the law, even if that law is specifically focused on the subject line of the e-mail and not its body. Conversely, it would be absurd for us to ignore the plain meaning of subsection (1)(b) simply because Old Navy would have to pay statutory penalties if it violated the law.

Lastly, Old Navy argues that we should look to *Chen* for guidance in evaluating subsection (1)(b)'s plain meaning even though the *Chen* court determined that the statutory provision is ambiguous. But *Chen*'s discussion of the statutory provision is of little help here. We conclude that RCW 19.190.020(1)(b) is not ambiguous. In Washington, "[n]o person may [send] . . . a commercial electronic mail message . . . that: . . . (b) [c]ontains false or misleading information in the subject line." RCW 19.190.020(1). This prohibition is not restricted to false or misleading information about the commercial nature of the e-mail.

2. RCW 19.190.020(1)(b) is not ambiguous

Old Navy argues that if subsection (1)(b) is ambiguous, legislative history endorses Old Navy's interpretation. Plaintiffs disagree and argue the provision is unambiguous. Ambiguity arises from statutory language, "not from considerations outside the statute." *Cerrillo*, 158 Wn.2d at 203-04. When a statute is subject to more than one reasonable interpretation, it is ambiguous, and we "'look to the legislative history of the statute and the circumstances surrounding its enactment to determine legislative intent.'" *Lake*, 169 Wn.2d at 527 (quoting *Rest. Dev.*, 150 Wn.2d at 682). We do not review legislative history if a provision is not ambiguous. *Evans*, 177 Wn.2d at 192 ("Plain language that is not ambiguous does not require construction.") If the plain meaning of a statute renders it unambiguous, "the court's inquiry is at an end." *Gray*, 174 Wn.2d at 927. Most importantly, a statute is not ambiguous "'merely because different interpretations are conceivable.'" *Id.* (internal quotation marks omitted) (quoting *Est. of Haselwood*, 166 Wn.2d at 498).

The plain language of subsection (1)(b) is not ambiguous. While the meaning of "[c]ontains false or misleading information in the subject line" may be broad, the language is clear. RCW 19.190.020(1)(b). The plain and clear provision does not lose its meaning and become ambiguous simply because Old Navy offers an interpretation that is arguably conceivable. We decline to find ambiguity where

16

none emerges from the text of the statute, related provisions, or the statutory context. Because we hold that subsection (1)(b) is not ambiguous, we will not review pertinent legislative history to determine the legislature's intent. The legislative intent underlying subsection (1)(b) is demonstrated by the provision's plain meaning.

3.  Case law does not support Old Navy's interpretation

Old Navy argues that our decision in *Heckel* (and the Court of Appeals decision that followed remand in that case) supports its interpretation of subsection (1)(b) because Heckel's subject lines deceived recipients "as to the nature of the body of the email—a commercial advertisement." Opening Br. on Certified Question for Defs. at 36 (citing *Heckel*, 122 Wn. App. at 71). It explains that the discrepancy between the information in a subject line and the body of an e-mail is what CEMA sought to fix. We disagree. CEMA does two things: it prohibits disguising the sender of commercial e-mail and it prohibits including false or misleading information in the subject line. We recognize that *Heckel* summarized RCW 19.190.020(1) as requiring that "[s]pammers must use an accurate, nonmisleading subject line, and they must not manipulate the transmission path to disguise the origin of their commercial messages." *Heckel*, 143 Wn.2d at 836. But *Heckel* was a constitutional challenge to CEMA on the theory that it violated the dormant commerce clause by burdening out-of-state spammers more than in-state

17

spammers. *Id.* at 826, 831. It was not concerned with the exact scope of the prohibition. Our holding that CEMA requires truthfulness in e-mail subject lines, and that such truthfulness does not depend on what the rest of the e-mail conveys, does not conflict with *Heckel*.

Old Navy seems to argue that *Heckel* supports the proposition that CEMA requires truthfulness only about the advertising purpose of the e-mail. We disagree that *Heckel* supports that interpretation and conclude such an interpretation contradicts the plain language of the statute.

4. Mere puffery and the consequence of plaintiffs' interpretation

Finally, Old Navy argues that plaintiffs' interpretation of subsection (1)(b) cannot be correct because such an interpretation would mean that commercial entities like Old Navy would "be susceptible to lawsuit—legitimate or not—with multi-million- or multi-billion-dollar exposure." Opening Br. on Certified Question for Defs. at 36. This argument parallels defendants' "absurd outcome" argument. But Old Navy would be susceptible to such exposure only if it violated the prohibition of subsection (1)(b), and a result is not absurd if it is the plain consequence of a clear statute.

Old Navy also explains that it is concerned with instances of banal hyperbole leading to "*millions* of dollars of potential exposure in CEMA liability." *Id.* at 37. It provides the example of a subject line that states "Best Deals of the

Year" and then suggests that if senders knew that "they might have excess inventory at the end of the year and might offer that inventory at a steep discount," then every single e-mail recipient would be entitled to $500 "regardless of whether a single recipient believed this to be the best sale of the year or not." *Id.* Old Navy asserts that "[t]his is not what CEMA was enacted to do." *Id.* While this is outside the scope of the certified question, we take this occasion to agree in part.

CEMA protects consumers by requiring that commercial e-mails communicate honestly about the terms of a given promotion or sale in the subject line. Promotions that state "Best Deals of the Year" are not misrepresentations and do not communicate information that retroactively becomes false (and actionable) under CEMA because market conditions change such that a better sale is later available.

Representations that constitute "mere statements of opinion, not of fact," are generally not actionable. *Grant v. Huschke*, 74 Wash. 257, 263, 133 P. 447 (1913). This principle emanates from case law about lawful title and warranties. *See, e.g.*, *id.*; *Carver-Shadbolt Co. v. Loch*, 87 Wash. 453, 455, 151 P. 787 (1915). But it is uniquely apt in this context. "[S]ubjective, unverifiable claims about a product or service are 'mere puffery' and cannot give rise to a false advertising claim." *Sauk-Suiattle Indian Tribe v. City of Seattle*, 25 Wn. App. 2d 741, 749, 525 P.3d 238 (2023); *State v. Living Essentials, LLC*, 8 Wn. App. 2d 1, 26, 436 P.3d 857 (2019).

19

"Mere puffery" has been described as vague or highly subjective terms that cannot be substantiated. *Living Essentials*, 8 Wn. App. 2d at 26. We hold that instances of mere puffery are not prohibited by subsection (1)(b). Mere puffery includes subjective statements, opinions, and hyperbole. Mere puffery is contrasted by representations of fact—like the duration or availability of a promotion, its terms and nature, the cost of goods, and other facts Washington residents would depend on in making their consumer decisions.

CONCLUSION

We hold that RCW 19.190.020(1)(b) prohibits sending Washington residents commercial e-mails that contain *any* false or misleading information in the subject lines of such e-mails.

González, J.

WE CONCUR:

Johnson, J.

Yu, J.

Montoya-Lewis, J.

Price, J.P.T.

*Brown v. Old Navy, LLC*

No. 102592-1

MADSEN, J. (dissenting)—The time and cost to Washington citizens who received deceptive commercial e-mails was a central concern of the "Commercial Electronic Mail Act" (CEMA), chapter 19.190 RCW. *E.g.*, ENGROSSED SUBSTITUTE H.B. 2752, 55th Leg., Reg. Sess. (Wash. 1998). To stem the flow of this electronic "spam," lawmakers intended to stop the transmission of e-mails with subject lines that disguised the true nature of the message—to sell something to the recipient. Thus, CEMA precludes sending an electronic message that "promot[es] real property, goods, or services for sale or lease," RCW 19.190.010(2), and "[c]ontains false or misleading information in the subject line." RCW 19.190.020(1)(b). In short, CEMA regulates e-mails sent for a commercial purpose with deceptive subject lines. RCW 19.190.010(2), .020(1)(b).

The federal court has asked us to consider the scope of RCW 19.190.020(1)(b), specifically whether subsection (1)(b) precludes sending e-mails containing any

deceptive information in the subject line or only those with subject lines concealing the e-mail's commercial purpose.

In my view, the plain language of the statute, the stated legislative intent and history, and state and federal case law preclude only those with subject lines concealing the e-mail's commercial purpose. *See State v. Heckel*, 122 Wn. App. 60, 71, 93 P.3d 189 (2004); *Weimin Chen v. Sur La Table, Inc.*, 655 F. Supp. 3d 1082, 1088-93 (W.D. Wash. 2023). The majority reaches the opposite conclusion by reading RCW 19.190.020(1)(b) in isolation from its context and legislative intent, contrary to our rules of statutory interpretation, and broadens the statute's reach beyond the legislature's intent.

Additionally, the majority's reasoning conflicts with our statutory analysis in *State v. Heckel* where we noted that a violation of the statute is discerned only from its header or subject line. 143 Wn.2d 824, 835, 24 P.3d 404 (2001). Under the majority's approach, it is impossible to discern if a subject line is misleading without comparing it to the body of the e-mail.

For these reasons, I respectfully dissent.

Analysis

In interpreting statutes, our "fundamental objective is to ascertain and carry out the Legislature's intent." *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002). "[I]f the statute's meaning is plain on its face, then the court must give effect to that plain meaning as an expression of legislative intent." *Id.* at 9-10. To

2

determine plain meaning, courts look at "all that the Legislature has said in the statute and related statutes which disclose legislative intent about the provision in question." *Id.* at 11. If a statute is subject to two or more reasonable interpretations, it is ambiguous and courts may consider legislative history and the "circumstances surrounding the enactment of the statute." *Five Corners Fam. Farmers v. State*, 173 Wn.2d 296, 312, 268 P.3d 892 (2011).

The parties offer competing interpretations of "false or misleading subject lines" in RCW 19.190.020(1)(b). Old Navy argues that CEMA prohibits an e-mail subject line that conceals the message's commercial nature, while Brown contends that CEMA broadly prohibits *any* false or misleading statements in an e-mail subject line. The majority agrees with Brown and opines that Old Navy impermissibly adds words to the statute. I disagree. It is Old Navy's reading, rather than Brown's, that follows our rules of statutory interpretation by incorporating the context of the statute and related statutes and maintains the scope of the statute as intended by the legislature. *See Campbell & Gwinn*, 146 Wn.2d at 11.

1. Plain Meaning of RCW 19.190.020(1)(b)

Read in isolation, and without context or reference to its many provisions, including its legislative history and the concerns the legislation was attempting to address, RCW 19.190.020(1)(b) may appear broad enough to cover *any* misstatement, as the majority holds. The majority's simple "plain meaning" analysis is attractive if we

focus only on the language in subsection (1)(b) of this complex statute and read it through the lens of protecting consumers from reading unwanted e-mail, rather than on the express intent of the legislature, which focused specifically on the pay-per-minute model of Internet access, protecting Internet providers and the public from the expense of storing and accessing "spam" e-mails.

This is not the first time we have been asked to navigate CEMA's "labyrinthine" statutory scheme. *Wright v. Lyft, Inc.*, 2016 WL 7971290, at *3 (W.D. Wash. Apr. 15, 2016) (court order). In *Wright v. Lyft, Inc.*, we navigated these labyrinthine waters by tracking CEMA's statutory development. 189 Wn.2d 718, 724, 406 P.3d 1149 (2017). Introduced in 1998, CEMA addressed the proliferation of unwanted electronic messages known as "'spam.'" *Id.* Lawmakers noted that sending e-mails consumed resources: electronic storage and memory space, delays in receipt of an expected message, and slowing down network speeds. S.B. REP. ON ENGROSSED SUBSTITUTE H.B. 2752, at 1, 55th Leg., Reg. Sess. (Wash. 1998). At the time, many consumers used Internet that charged in increments of time; thus spam recipients had to pay to download messages. *Id.*

Washington was on the forefront of enacting antispam laws but was soon joined by states around the country and the federal government. In 1998, a Federal Trade Commission report discussed the "common issue" of spammers forging e-mail header information to "'avoid detection, frustrate remove requests, misdirect replies, and generally frustrate efforts by users to prevent'" repeated receipt of spam e-mail. Amici

Curiae Br. of Retail Litig. Ctr. & Wash. Retail Ass'n at 6 (quoting AD-HOC WORKING

GRP. ON UNSOLICITED COM. EMAIL, REPORT TO THE FEDERAL TRADE COMMISSION 13

(1998)). The federal antispam law banned e-mail subject lines that are "likely to mislead

a recipient . . . about a material fact regarding the contents or subject matter of the

message." 15 U.S.C. § 7704(a)(2). States like Nevada, Illinois, and Texas also passed

antispam bills, the intent of which was to preclude e-mails with subject lines that

concealed the nature of the message. Amici Curiae Br. of Retail Litig. Ctr. et al at 9-11

(citing Assembly Comm. on Judiciary, Minutes of the Meeting (Nev. Feb. 27, 2003) at 3;

S. Transcript, 93d Gen. Assemb., Reg. Sess. 44, at 28 (Ill. May 13, 2003); H. RSCH. ORG.

B. ANALYSIS ON H.B. 1282, at 3-4 (Tex. Apr. 2, 2003)). Other states went further to

require an "advertisement" label in the e-mail subject line. *See id.* at 10-11 (citing laws

from 10 states).

2. "All That the Legislature Has Said in the Statute and Related Statutes"

Turning to Washington's provision, RCW 19.190.020 provides:

(1) No person may initiate the transmission, conspire with another to initiate the transmission, or assist the transmission, of a commercial electronic mail message from a computer located in Washington or to an electronic mail address that the sender knows, or has reason to know, is held by a Washington resident that:
 (a) Uses a third party's internet domain name without permission of the third party, or otherwise misrepresents or obscures any information in identifying the point of origin or the transmission path of a commercial electronic mail message; or
 (b) *Contains false or misleading information in the subject line.*

(Emphasis added.) The statute defines "commercial electronic mail message" as a message "sent for the purpose of promoting real property, goods, or services for sale or lease." RCW 19.190.010(2).

RCW 19.190.020(1)(a), the provision that precedes subsection (1)(b), precludes transmitting an e-mail that "[u]ses a third party's internet domain name without permission of the third party, or otherwise misrepresents or obscures any information in identifying the point of origin or the transmission path of a commercial electronic mail message." This provision prohibits senders from concealing who and where a commercial e-mail is coming from. Subsection (1)(b) immediately follows and must be read in harmony as each subsection flows from the same preamble.

Read together with the preamble, these subsections make a single sentence that addresses the places where a commercial e-mail can deceive the recipient regarding the true nature of the e-mail—in the "header" or the "subject" line. Viewing subsection (1)(b) in context, the legislature intended both subsections to address the same problem, preventing the sending of e-mails intended to hide the e-mail's origin and the fact that it is an unsolicited commercial message.

This interpretation is supported in the statement of legislative intent outlined in the session law. The legislature was concerned about the "volume of commercial electronic mail being sent" and the ability of Internet provider *filtering systems* to "screen out unsolicited commercial electronic mail messages when senders use a third party's internet domain name without the third party's permission, *or otherwise misrepresent the*

6

*message's point of origin.*"  LAWS OF 1998, ch. 149, § 1 (emphasis added).  The

legislative findings conclude by explaining that lawmakers sought to provide "immediate

relief to *interactive computer service providers* by prohibiting the sending of commercial

[e-mails] that . . . contain untrue or misleading information in the subject line."  *Id.*

(emphasis added).  These findings tie the legislature's motivation for enacting CEMA not

to e-mail recipients but to Internet service providers.  And, these findings reflect the

legislature's intent to prevent unsolicited commercial e-mails in which the sender

misrepresents their identity.  The law does not address the more general problem that

Brown complains of here: an *accurately* identified commercial entity sending e-mails

with potentially misleading subject lines—misleading only when read in conjunction with

the e-mail content.

The statement of intent demonstrates that the prohibition against including false or

misleading information in an e-mail subject line was enacted with a *narrow* purpose—to

prevent senders from misrepresenting the message's "point of origin."  This purpose

supports Old Navy's interpretation of the statute.

As a related statute, the Consumer Protection Act (CPA), ch. 19.86 RCW, aids our

determination of CEMA's plain meaning.  *See Campbell & Gwinn*, 146 Wn.2d at 11.

Washington's CPA prohibits "[u]nfair methods of competition and unfair or deceptive

acts or practices in the conduct of any trade or commerce."  RCW 19.86.020.  *Chen*, a

recent federal case, examined Washington's CPA in determining how to interpret

subsection (1)(b) and concluded that it supports a narrow reading of the provision.  655 F.

Supp. 3d at 1089. *Chen* noted that if CEMA's prohibition on misleading information in subject lines was read more broadly, it would encroach on the CPA's provisions about false advertising. *Id.* The law would then punish false advertising in e-mail subject lines more severely than false advertising elsewhere. *Id. Chen* concluded that CEMA should be interpreted narrowly to focus on the area relevant to the statute's focus, as are other statutes that prohibit false advertising in a certain context—for example, RCW 19.25.100, which prohibits false representations in music advertising. *Id.* at 1090. This is a reasonable interpretation of CEMA in light of its context.

The majority claims that a broad interpretation of subsection (1)(b) does not duplicate the CPA's ban on false or misleading marketing because it imposes greater penalties. Majority at 13-14. The majority also points out that the legislature may decide that false information in this specific context (appearing in e-mail subject lines) is particularly harmful to consumers and thus punish it more harshly. *Id*.

True, the legislature is free to make these kinds of judgments. However, while this may make the majority's interpretation of the statute *conceivable*, it is not enough to make it *reasonable*, particularly where the statutory context weighs strongly in favor of an alternative interpretation. *See Agrilink Foods, Inc. v. Dep't of Revenue*, 153 Wn.2d 392, 396, 103 P.3d 1226 (2005) (stating that "'a statute is not ambiguous merely because different interpretations are conceivable'" (quoting *State v. Hahn*, 83 Wn. App. 825, 831, 924 P.2d 392 (1996))).

In addition, the majority is quick to abandon *Chen*. Majority at 5, 15. I disagree. Although *Chen* stated that the plain language of CEMA is ambiguous, its analysis of the statutory context supports what I have attempted to show above—that RCW 19.190.020 plainly prohibits sending commercial e-mails with subject lines designed to mislead the recipient about the commercial nature of the message.

In my view, subsection (1)(b) is unambiguous when read in the context of the whole statute, considering the circumstances of its enactment, and interpreted in tandem with the CPA. Therefore, I would hold that RCW 19.190.020(1)(b) prohibits false or misleading information in the subject line of a commercial e-mail as to the e-mail's commercial nature.

The majority *agrees* that RCW 19.190.020(1)(b) is unambiguous but comes to a very different conclusion. It says that Old Navy adds language to subsection (1)(b) that limits its reach to the commercial nature of the e-mail. However, reading the entire statute, it is the majority that broadens the reach to *any* false or misleading statement, even an e-mail that accurately identifies itself in the subject line. The majority gives subsection (1)(b) a much bigger job than the remainder of this single issue statute supports.

3. Legislative History of RCW 19.190.020(1)(b)

Even if the majority's plain meaning analysis is reasonable, this only makes the statute ambiguous. When a statute is ambiguous, we may consult the legislative history

9

for further guidance. *See Campbell & Gwinn*, 146 Wn.2d at 12. The legislative history supports Old Navy's interpretation: read as a whole, CEMA prohibits subject lines that conceal the commercial nature of the message. As previously discussed, Washington's legislature enacted CEMA in 1998 in response to a large increase in unsolicited commercial e-mail. ENGROSSED SUBSTITUTE H.B. 2752, 55th Leg., Reg. Sess. (Wash. 1998). The legislature observed that these e-mails are costly for recipients who cannot refuse them and must spend time reviewing each message to determine its origins. *Id.* The legislature also noted that these unsolicited commercial e-mails are often indistinguishable from other electronic messages, forcing recipients to "wade through unwanted advertisements to obtain those messages they wish to receive." SUBSTITUTE H.B. 2752, at 1, 55th Leg., Reg. Sess. (Wash. 1998).

As originally introduced, CEMA would have precluded sending spam, with limited exceptions. Transmitting commercial e-mail would have been allowed only when businesses have an existing relationship with the sender, to collect an existing obligation, or if a person consented to receive the e-mail. H.B. ANALYSIS ON H.B. 2752, 55th Leg., at 2-3, Reg. Sess. (Wash. 1998). Even in these circumstances, the original legislation required senders to include the term "advertisement" as the first word of the e-mail subject line. *Id.* at 3. In short, the original bill was meant to "prohibit unwanted spam outright and to make it easy for internet users to identify such advertisements so that they could be avoided or deleted with ease." *Chen*, 655 F. Supp. 3d at 1091 (discussing legislative history of CEMA). The original legislation was modified based on First

10

Amendment to the United States Constutition concerns, forgoing an outright ban and dropping the "advertisement" requirement. *Id.*

The legislature revised the bill, but the concerns motivating CEMA's enactment remained. The senate bill report noted the same problems with unsolicited commercial e-mail, namely, that the recipient must pay to download and store the messages. S.B. REP. ON ENGROSSED SUBSTITUTE H.B. 2752, at 1, 55th Leg., Reg. Sess. (Wash. 1998). Spammers also "disguise[d] advertisements by putting false or misleading information on the subject line of the messages." *Id.* At one legislative hearing, a supporter stated that "in most cases, the unsolicited commercial messages appear with deceiving text in the subject field," using subject lines like "'Hi There!', 'Information Request' and 'Your Business Records.'" Br. of Wash. Ass'n of Internet Serv. Providers, *State v. Heckel*, No. 69416-8 (Wash.), *reprinted in* 13 Briefs 143 Wn.2d (2001) (App. 2 Hr'g on H.B. 2752 Before the Wash. H. Comm. on Energy & Utils. (Jan. 28, 1998) (testimony of Ed McNichol) (App. 2 Hr'g)). The supporter noted that this "deceptive practice makes it virtually impossible to discern junk e-mail from the messages critical to my business." *Id.* (App. 2 Hr'g).

Additionally, the legislature created a task force to "evaluate whether existing laws are sufficient to resolve technical, legal, or financial problems created by the increasing volume of commercial electronic mail messages." FINAL B. REP. ENGROSSED SUBSTITUTE H.B. 2752, at 2, 55th Leg., Reg. Sess. (Wash. 1998). This task force generated a report summarizing CEMA and stated that "'it is unlawful to misrepresent

11

who is really sending the message, where a message is actually originating, *or what the true subject of the message is*.'" Opening Br. on Certified Question for Defs. at 33 (quoting H. OFF. OF PROGRAM RSCH. & S. COMM. SERVS., COMMERCIAL ELECTRONIC MESSAGES SELECT TASK FORCE REPORT (Nov. 1998)).

This legislative history supports Old Navy's position that RCW 19.190.020(1)(b) prohibits only false or misleading information in e-mail subject lines that conceals the commercial nature of the message. Lawmakers wanted to ease consumers' access to e-mail by saving time and resources. The legislature sought to ensure that e-mail recipients would know immediately upon receipt who the sender was and whether it was commercial. Nothing in the legislative history suggests that CEMA was meant to address situations such as the one presented in this case, where a clearly identified company sends commercial e-mails that advertise a sale but are misleading about the duration of the sale when read in conjunction with the content of the e-mail.

Moreover, CEMA has been amended several times, and these amendments support Old Navy's interpretation of subsection (1)(b). We discussed these amendments in *Wright* when interpreting RCW 19.190.040's damages provision. 189 Wn.2d at 724-25. The legislature first amended CEMA to clarify that a person can violate the CPA by either transmitting or assisting in the transmission of an unsolicited commercial e-mail. *Id.* at 724. Several years later, the legislature amended CEMA by adding a provision that precluded parties from sending commercial text messages to Washington residents. *Id.* at

12

724-25.  Lastly, the legislature amended CEMA to add protections against phishing.[1]  *Id.* at 725.  The statute's amendments are narrow, prohibiting specific deceptive practices that are unique to the electronic medium. This supports a conclusion that subsection (1)(b) was also intended to apply narrowly to solve a specific problem: tricking consumers into opening commercial e-mails disguised as personal or business inquiries.

It is also helpful to look at the guidance that appears on the Washington Attorney General's Office website.  Informal guidance appearing on an agency website is not binding and is not a substitute for an official attorney general opinion.  Even so, the examples provided here support Old Navy's interpretation of the statute.  The website directs consumers to "[c]arefully examine the body of the email message as it relates to the email's subject line" and see if "it accurately describe[s] what is contained in the email" to determine whether the subject line would violate CEMA.  *Washington's Law*, Wash. State Off. of Att'y Gen., https://www.atg.wa.gov/washingtons-law [https://perma.cc/SB2C-6RHJ].  Similarly, the website also states that a subject line does not violate CEMA if it "clearly represents what is being sent."  *Id.*  These statements appear to support Old Navy's interpretation and suggest that only subject lines concealing that the e-mail is actually an advertisement or solicitation are illegal.  But in helping consumers determine what is deceptive, the website also suggests consumers ask

---

[1] "'Phishing' generally refers to Internet activity using fraudulent e-mails and websites to induce someone to reveal personally identifying information under false pretenses." *Wright*, 189 Wn.2d at 725.

13

themselves if the subject line creates "a false sense of urgency." *Id.* Brown argues that

Old Navy's subject lines misrepresenting the duration of sales create a false sense of

urgency and thus, applying this guidance, violate CEMA. However, examples of subject

lines that have been found to violate CEMA—such as "board meeting 3ish" and

"URGENT – Account Update"—all disguised the fact that the e-mail was truly a

solicitation. *Id.* Thus, the majority of the website's content supports Old Navy's

interpretation.

As the majority points out, we also analyzed CEMA and the problem it was

designed to fix in *Heckel*, when this court considered whether CEMA unconstitutionally

burdened interstate commerce. Majority at 16-17 (citing 143 Wn.2d at 831). I disagree,

however, with the majority's conclusion that *Heckel* does not support a narrower

construction of subsection (1)(b). In *Heckel*, we acknowledged that "the use of false or

misleading subject lines further hampers an individual's ability to use computer time

most efficiently." 143 Wn.2d at 835. We relied on the same legislative history discussed

above to find that subject lines like "'Hi There!,' 'Information Request,' and 'Your

Business Records'" are problematic because they make it difficult to distinguish spam

from legitimate messages. *Id.* After identifying this issue, we stated that senders of

unsolicited commercial messages must "use an accurate, nonmisleading subject line." *Id.*

at 836.

*Heckel*'s reliance on legislative history is instructive, as is its discussion of CEMA

in the context of the dormant commerce clause of the United States Constitution. States

14

violate the dormant commerce clause "when they enact laws that unduly burden interstate commerce." *Heckel*, 143 Wn.2d at 832. *Heckel* concluded that CEMA is facially neutral and that its local benefits "surpass any alleged burden" on interstate commerce. *Id.* at 833. *Heckel* reviewed the costs of spam to Internet providers and users, such as "false or misleading subject lines" that make it "'virtually impossible'" to distinguish spam from legitimate personal or business messages. *Id.* at 835, 836. The government has a substantial interest in preventing the cost-shift from spammers to e-mail users, which is akin to telemarketer calls to a "pay-per-minute cellular phone." *Id.* at 835. CEMA's requirement of truth in an e-mail subject header does not burden commerce "but actually 'facilitates it by eliminating fraud and deception'" from commercial messages. *Id.* at 836 (quoting Jack L. Goldsmith & Alan O. Sykes, *The Internet and the Dormant Commerce Clause*, 110 YALE L.J. 785, 819 (2001)).

Inherent in *Heckel*'s discussion is the link between CEMA's truthfulness in an e-mail header and preventing distortion of the commercial nature of the message. *See id.* at 835-36. Broadening CEMA's scope to prohibit any false or misleading e-mail subject line, as Brown urges, cuts this critical link. Instead, *Heckel* counsels a narrower reading.

The majority's analysis leaves several important gaps. First, the majority states that it agrees with *Heckel* in that we should evaluate "'the subject line alone'" when determining whether it is misleading. Majority at 9 (quoting *Heckel*, 122 Wn. App. at 71). Much like its broader reasoning, the majority isolates this quote from critical context. It is impossible to discern if a subject line is misleading without comparing it to the body of the e-mail.

15

The court's analysis in *Heckel* exemplifies this as, although *Heckel* stated we need only look to the subject line, it went on to explain how the subject line was misleading in conjunction with the body of the e-mail, which was a commercial advertisement. *Id.*

Finally, the e-mails sent by Old Navy are very different from the examples in *Heckel* and the legislative history. The Old Navy e-mail subject lines show they are commercial in nature. The e-mail subject lines that *Heckel* stated would likely violate subsection (1)(b) ("'Hi there!,'" "'Your Business Records,'" "'Did I get the right email address?,'" "'For your review—HANDS OFF!'") said nothing of the message's commercial nature. 143 Wn.2d at 835, 829. The legislative history identifies multiple examples of the precise type of e-mail lawmakers sought to preclude, those that enticed a recipient to download them and thereby tax the service provider network. Such specific examples cut against the majority's expansive reading of RCW 19.190.020(1)(b).

## Conclusion

In my view, RCW 19.190.020(1)(b) is unambiguous and prohibits only subject lines with misleading information about the commercial nature of the message. Even if the majority's plain meaning analysis provided another reasonable interpretation, the statute would be ambiguous and require the court to consider its legislative history. It is clear that RCW 19.190.020(1)(b) was enacted to combat the flood of spam to consumers' in-boxes and to prevent consumers from having to sort through unsolicited commercial e-mails disguised as something else.

16

Accordingly, I dissent.

_____
Madsen, J.

_____
Stephens, C.J.

_____
Gordon McCloud, J.

_____
Whitener, J.